RALPH O. BLOEMERS, OSB No. 984172
ralph@crag.org - (503) 525-2727
CHRISTOPHER G. WINTER, OSB No. 984355
chris@crag.org - (503) 525-2725
Crag Law Center
917 SW Oak Street, Suite 417
Portland, OR 97205
Fax: (503) 296-5454
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| HOOD RIVER VALLEY RESIDENT'S COMMITTEE, an Oregon non-profit corporation, MIKE MCCARTHY, individually<br>*Plaintiffs,*<br><br>HOOD RIVER COUNTY by and through the BOARD OF COUNTY COMMISSIONERS OF HOOD RIVER COUNTY, an Oregon municipal corporation and MT. HOOD MEADOWS OREGON, LLC, an Oregon limited liability corporation,<br><br>*(Proposed) Involuntary Plaintiff*<br><br>v.<br><br>JIM PEÑA, Regional Director of Region 6 of the United States Forest Service, LISA NORTHROP, Supervisor, Mt. Hood National Forest of the United States Forest Service; TOM TIDWELL, Chief, United States Forest Service, and UNITED STATES FOREST SERVICE, an Administrative Agency of the United States Department of Agriculture,<br><br>*Defendants.* | Case No.: 3:15-cv-1397<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(Pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(1), and the Omnibus Public Lands Management Act of 2009 (PL 111-11)) |

## INTRODUCTION

1.      This action is brought under Section 706(1) of the Administrative Procedure Act, 5 U.S.C. § 706(1), challenging an agency failure to take action required by law.  Plaintiffs HOOD RIVER VALLEY RESIDENTS COMMITTEE ("HRVRC") challenge the failure of Defendants JIM PEÑA, Regional Director of Region 6, LISA NORTHROP, Supervisor of the Mt. Hood National Forest, TOM TIDWELL, the Chief of the United States Forest Service, and the U.S. FOREST SERVICE (collectively the "Forest Service") to take the required actions to implement the Government Camp/Cooper Spur land exchange as directed in and consistent with Section 1206 of the Omnibus Public Lands Management Act of 2009 (Pub. L. 111-11).  The Government Camp/Cooper Spur land exchange would resolve a dispute over proposed development on the north side of Mt. Hood and guide future development on the south side of Mt. Hood consistent with local zoning and planned growth.

2.      The North side of Mt. Hood at Cooper Spur contains roadless wildlands, a drinking watershed, old-growth forests, and a unique backcountry winter sports area containing many historic structures from the late 1800s and early 1900s.  The structures include the Cloud Cap Inn, the Tilly Jane A-Frame, the Tilly Jane Guard Station, an outdoor amphitheater and other structures.  The area has been used and enjoyed for winter recreation since the 1870s.  The area also contains the Cooper Spur Ski Area, a small ski area of about 50 acres in size, and the historic Tilly Jane Trail.

3.      This area on the North side of Mt. Hood is commonly known as Cooper Spur and also includes the source of the Crystal Springs Drinking Watershed, a 6.9 square mile area that feeds a spring relied upon by about 25% of the residents of Hood River County.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF - 2

4.      In 2001, local residents in Hood River County grew concerned about a proposal by the County to trade away over 620 acres of county-owned land in the Crystal Springs Drinking Watershed to Mt. Hood Meadows Oregon, LLC ("Mt. Hood Meadows") for development.  The Board of Commissioners of Hood River County proceeded with the controversial trade despite strong public opposition.

5.      Around the same time, Mt. Hood Meadows purchased the Inn at Cooper Spur, located on private land, and, separately, the Cooper Spur Ski Area, located on Forest Service land.  Mt. Hood Meadows then proposed to build a large four-season destination resort encompassing the land it received from Hood River County, the private land associated with the Inn at Cooper Spur, and the Cooper Spur Ski Area.  Cumulatively, Mt. Hood Meadows proposed development on well over 2,000 acres of land on the historic North side of Mt. Hood.

7.      The HRVRC learned about each of these proposals and took legal action to oppose the land trade and the destination resort proposal.  The HRVRC filed suit against the land trade in Oregon state court on March 27, 2002.  *See Hood River Valley Residents Comm. v. Bd. of Cty. Comm'rs of Hood River Cty.*, Hood River County Case No. 020029CC.  The HRVRC also opposed the designation of the land in Cooper Spur as being suitable for a destination resort by Hood River County under Oregon land use law.

8.      In 2003, Congressmen Walden and Blumenauer held their first summit at Timberline to publicly discuss the possibility of additional Wilderness protections for Mt. Hood, which included the possibility of protections for the North side of Mt. Hood.

9.      In June of 2004, in HRVRC's case challenging the land trade between Hood River County and Mt. Hood Meadows, the Oregon Court of Appeals reversed and remanded an order of the Hood River County Circuit Court dismissing the case on jurisdictional grounds.  *See*

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF - 3

*Hood River Valley Residents Comm.. v. Bd. of Cty. Comm'rs of Hood River Cty.*, 193 Ore. App.

485 (2004).  Thereafter, the parties entered into mediated settlement discussions with each other.

10.     In the summer of 2004, Senator Wyden advanced his vision for Wilderness on the

Mt. Hood National Forest, including Wilderness for the Cooper Spur area.

11.     Later in the summer of 2004, Congressmen Blumenauer and Walden held a

second Summit on the mountain to discuss the public's vision for Mt. Hood, which included the

possibility of additional Wilderness on the Mt. Hood National Forest.

12.     On July 6, 2005, after over four years of legal battles over the land trade and more

than a year of mediation, the parties involved in the dispute over the North side agreed on the

terms of an historic settlement that would resolve the dispute.  Attached as Exhibit 1 (the

"Settlement Agreement").  The terms of the Settlement Agreement provide for permanent

protection of the North side of Mt. Hood as federal Wilderness, designation of the Crystal

Springs Drinking Watershed as a watershed protection zone, and preservation of the historic,

natural and scenic setting of this area of Mt. Hood.

13.     A core component of the historic settlement was the Government Camp/Cooper

Spur land trade between Mt. Hood Meadows and the United States Forest Service in which Mt.

Hood Meadows would offer up equal value land on the North side of Mt. Hood in exchange for

approximately 120 acres of Forest Service land within the Government Camp community

revitalization zone on the south side of Mt. Hood (the "Government Camp properties").

14.     The Government Camp properties are owned by the Forest Service and have been

zoned by Clackamas County for low-density residential use.  The land surrounding the

Government Camp properties is already developed, and the land is primarily second-growth

forest and is dominated by signs of past development, including roads, trails and timber harvest.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF - 4

15.     After signing the Settlement Agreement, the HRVRC then met with other stakeholders and the two Congressmen at Timberline to discuss the proposal.  In the fall of 2005, the Congressmen held another two summits, in Hood River and Portland, where the settlement was publicly unveiled.

16.     Because the terms of the Settlement Agreement required federal legislation, the parties spent the next several years working with Oregon's Congressional delegation for passage of that legislation in Congress.  On March 30, 2009, President Obama signed the Omnibus Public Land Management Act into law.  Attached as Exhibit 2 (relevant excerpts).

17.     Section 1206(a)(2)(F) of the Act directs the Forest Service to complete the Government Camp/Cooper Spur land exchange envisioned in the Settlement Agreement "within 16 months after the date of enactment of this Act."

18.     Section 1202(c)(2) includes designation of new Wilderness in the Cooper Spur area contingent upon the completion of the Government Camp/Cooper Spur land exchange in Section 1206.

19.     Section 1205 includes the establishment of the Crystal Springs Watershed Special Resource Management Unit ("Crystal Springs Management Unit") also contingent upon the completion of the Government Camp/Cooper Spur land exchange in Section 1206.

20.     Five years elapsed after the passage of the Act and on September 12, 2014, Senator Ron Wyden and Congressman Blumenauer wrote to Mt. Hood Forest Supervisor Lisa Northrop stating:

> As you know, the Government Camp/Cooper Spur land exchange would resolve decades of dispute over proposed development on the north side of the mountain, and guide future development on the south side in a manner that is consistent with local zoning and planned growth. The land exchange has bipartisan support from the Oregon Congressional delegation, as well as local businesses, conservation organizations, and citizens groups. Unfortunately despite the hard work of many,

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF - 5

including Forest Service staff, this exchange has dragged on far beyond the time period laid out in the legislation and has suffered from a lack of resources and staff, who have frequently changed during this process. We urge you to put in the resources needed to get this exchange completed swiftly.

Attached as Exhibit 3.

21.     On June 30, 2015, Senator Wyden, Senator Merkley and Congressman

Blumenauer wrote to the Forest Service stating:

> [C]ompletion of the exchange is exceptionally behind the schedule set by the 2009 Act.  In that legislation, Congress required the Forest Service to complete the exchange within 16 months. It has now been nearly 75 months, and the parties have yet to reach agreement over the terms of the wetland conservation easement, one of several remaining components….we call upon the agency to complete the remaining components of the land exchange within one year from the date of this letter in order to avoid further noncompliance with the statutory deadline and further frustration of the intent of the 2009 Act.. The Forest Service has not acted within the direction provided by Congress.

Attached as Exhibit 4.

22.     More than six (6) years since President Obama signed the Act into law, the Forest

Service still has not completed the land trade in Section 1206 of the Act.

23.     As a result of the delay, the Wilderness designation at Cooper Spur and the

creation of the Crystal Springs Management Unit, which are contingent upon completion of the

Government Camp/Cooper Spur land exchange, have yet to occur.

24.     Plaintiffs seek a declaratory judgment that the Forest Service has unlawfully

withheld or unreasonably delayed agency action mandated by Congress and an injunction

ordering the Forest Service to complete the Government Camp/Cooper Spur land trade in a

prompt fashion.  Plaintiffs request that the Court retain continuing jurisdiction to oversee

compliance with the injunction.

25.     If they prevail, Plaintiffs also intend to recover their attorneys' fees and costs

pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2727*

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory judgment), and 28 U.S.C. § 2202 (injunctive relief). The challenged agency inaction is subject to this Court's review under the APA, 5 U.S.C. § 706(1).

27.     Venue is this Court is proper under 28 U.S.C. § 1391(e), because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and a substantial part of the land at issue is within this judicial district.  Plaintiffs each reside in and maintain their primary place of business in this judicial district.  The Mt. Hood National Forest is in this district.

## PARTIES AND STANDING

28.     Plaintiff Hood River Valley Residents Committee is an Oregon non-profit corporation that is also a tax-exempt charitable organization based in Hood River, Oregon.  The HRVRC has a defined membership that votes to pursue specific policies by and through its formally elected board of directors.  The HRVRC works in the public interest and is specifically dedicated to the preservation of the Hood River Valley's unique quality of rural life through public education, monitoring and enforcement of applicable laws.  The HRVRC's well-defined mission is to conserve farm and forest lands, curb urban sprawl, scale development to fit the limits of available natural resources and the costs of public services, and to protect wildlife habitat, open space and lands with scenic value.  The HRVRC was formed in the 1970s and its members have personally participated in the numerous hearings and meetings on the proposed solution for the North side of Mt. Hood that was directed by the Act.

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2727*

29.     Plaintiff Mike McCarthy ("McCarthy") is a resident of Hood River County and a member of the HRVRC.  McCarthy owns property near the land that is the subject of this dispute and is a party to the settlement agreement between the HRVRC, Mt. Hood Meadows and the County.  As a resident of Hood River County, Mike McCarthy has a substantial interest in the disposition of public land that has been directed by Congress to be transferred to a private entity as a result of the land exchange, and, as a nearby landowner, Mike McCarthy has a substantial interest in the use and disposition of the property subject to the land exchange.  Mike McCarthy is likely to suffer from less use and enjoyment of the existing and proposed federal lands, increased conflicts with his farming operations, decreased water quality and harm to the aesthetic values that the farm and forest-focused community provides, including an ability to see the night sky and limited traffic, if the Congressionally-mandated trade is not completed and the contingent protections for new Wilderness and the Crystal Springs drinking watershed protections are not put in force.

30.     The Forest Service's failure to comply with the Congressional mandate as set forth in the Act injures the substantial interests of the HRVRC and its members, including Mike McCarthy, and threatens the proposed settlement and solution.  The HRVRC is harmed because its purpose, mission and goals are thwarted by the Forest Service's failure to meet the deadline and its members' recreational, aesthetic and personal interests are practically and negatively affected by the agency's failure to protect the North side of Mt. Hood.  The transfer of private lands, which were previously available to the public and are lands that provide the water supply for a significant amount of residents of Hood River County, into public forestland, which will be available to the public to provide recreational opportunity and unique aesthetic qualities, is of great public interest.  The HRVRC and its members are negatively affected by the agency's

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF - 8

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2727*

failure to follow the Congressional direction.  The members of HRVRC own property near Cooper Spur on the North side of Mt. Hood and regularly use these lands for their personal enjoyment and have definite plans to return to those lands in the future.

31.     As residents of Hood River County, the HRVRC's members have a substantial interest in the use and disposition of Meadows-owned property subject to the land exchange. The failure to protect the North side as directed in the Act will harm their interests in these pursuits.

32.     The HRVRC's members use and enjoy the Mt. Hood National Forest, including the Cooper Spur area, for hiking, biking, fishing, hunting, camping, photographing and enjoying scenery and wildlife, backcountry skiing, snowshoeing, mountaineering, and engaging in other vocational, scientific, and recreational activities.  The HRVRC's members derive recreational, inspirational, religious, scientific, educational, and aesthetic benefit from their activities within this national forest.

33.     The HRVRC's members have educational, scientific, aesthetic, conservation and recreational interests that have been and will continue to be adversely affected and irreparably injured by Defendants' failure to develop and implement the Government Camp/Cooper Spur land exchange that will protect the North side of Mt. Hood as specified in the Act.  The HRVRC's members intend to continue to use and enjoy the Mt. Hood National Forest, including the project area and the lands and waters that will be protected per the Congressional direction in the Act, frequently and on an ongoing basis in the future.  The HRVRC and its members will suffer actual, concrete injuries caused by defendants' failure to comply with mandatory duties under the Act and the APA.  The relief the HRVRC seeks would redress these injuries.

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2727*

*(Proposed) Involuntary Plaintiffs*

34.    Proposed Involuntary Plaintiff BOARD OF COUNTY COMMISSIONERS OF HOOD RIVER COUNTY (the "County"), acting by and through its agents, including, but not limited to, the Board of County Commissioners, is a charter home rule county organized under the laws of Oregon. The Board of County Commissioners is the "county court" that is the governing body of the County able to make the decisions for it.

35.    The County is a party to the Settlement Agreement and a necessary party to this suit.  The Settlement Agreement contains obligations of the County that are contingent upon the completion of the trade.  The County has invested countless hours of its staff resources into the implementation of the settlement, and its interests are directly harmed by the failure of the Forest Service to comply with the terms of the Act.  It is proper for the County to be joined as an involuntary plaintiff, because the County's interests are aligned with Plaintiffs, in that they want an expeditious completion of the terms of the settlement that required the land exchange be completed in 16 months consistent with the Act.

36.    Proposed Involuntary Plaintiff MT. HOOD MEADOWS, OREG., LLC is a Limited Liability Company organized under the laws of the State of Oregon ("Mt. Hood Meadows").  Mt. Hood Meadows is the recipient and current owner of County property and County funds that were traded and paid to it respectively pursuant to a land exchange completed in 2001 that was the subject of a suit filed by the HRVRC.  Mt. Hood Meadows is a party to the Settlement Agreement and a necessary party to this suit.

37.    Mt. Hood Meadows holds a special use permit from Defendant UNITED STATES FOREST SERVICE for their operations at the Cooper Spur Ski Resort and Mt. Hood Meadows Ski Resort.  Mt. Hood Meadows has been notified of this complaint and is unwilling to

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2727*

voluntarily join the litigation against the Forest Service.  Mt. Hood Meadows can and should be joined as an involuntary plaintiff under Fed. R. Civ. Pro. 19(b).  Mt. Hood Meadows is a party to the Settlement Agreement, an owner of the lands offered in trade, and thus a necessary party to this suit.  It is proper for Meadows to be joined as an involuntary plaintiff, because Mt. Hood Meadows' interests are aligned with Plaintiffs, in that they want an expeditious completion of the terms of the settlement that required the land exchange be completed in 16 months consistent with the Act.

38.     Both the County and Mt. Hood Meadows are persons who must be joined as plaintiffs in this action under Fed. R. Civ. Pro. 19, because without their presence in this action complete relief cannot be accorded among the parties.  Furthermore, permissive joinder is also available, as the County and Mt. Hood Meadows may be joined in this action as a plaintiff, because plaintiff HRVRC is asserting a right to relief in respect to or arising out of the Settlement Agreement, a transaction between HRVRC, Mt. Hood Meadows and the County.

39.     Without Mt. Hood Meadows and the County, the Court cannot accord complete relief among existing parties.  For the foregoing reasons, Mt. Hood Meadows and the County are properly named as involuntary plaintiffs.

### Defendants

40.     Defendant JIM PEÑA is the Director of Region 6 (Pacific Northwest Region) of the United States Forest Service ("Region 6 Director").  The Region 6 Director is the official ultimately responsible for compliance with all laws applicable to the Mt. Hood National Forest, including the Omnibus Public Lands Management Act of 2009 and the APA.  Mr. Peña is sued in his official capacity.

41.     Defendant LISA NORTHROP is the Forest Supervisor ("Supervisor") of the Mt. Hood National Forest of U.S. Forest Service ("Forest Service").  She is legally responsible for overseeing Forest Service activities, including the timely completion of the exchange.  Ms. Northrop is sued in her official capacity.

42.     Defendant TOM TIDWELL is the Chief ("Chief") of the United States Forest Service.  He is legally responsible for overseeing Forest Service activities, including the timely completion of the exchange.  Mr. Tidwell is sued in his official capacity.

43.     Defendant UNITED STATES FOREST SERVICE is an agency of the United States and is a division of the Department of Agriculture.  The Forest Service is responsible for implementing and/or complying with the Omnibus Public Lands Management Act of 2009 and owns the Government Camp properties.

## LEGAL BACKGROUND

44.     The Omnibus Public Lands Management Act of March 30, 2009 (123 Stat. 991, Pub. L. 111-11) directs the Forest Service to complete the exchange of public lands located north of the Government Camp Loop Road in Government Camp, Oregon for land owned by Mt. Hood Meadows that is located in the vicinity of the Cooper Spur Ski Area.

45.     Section 1206(a)(2)(A) of the Act provides: "(A) CONVEYANCE OF LAND.— Subject to the provisions of this subsection, if Mt. Hood Meadows offers to convey to the United States all right, title, and interest of Mt. Hood Meadows in and to the non-Federal land, the Secretary shall convey to Mt. Hood Meadows all right, title, and interest of the United States in and to the Federal land (other than any easements reserved under subparagraph (G)), subject to valid existing rights."

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2727*

46.     Section 1206(a)(2)(F) provides: "(F) DEADLINE FOR COMPLETION OF

LAND EXCHANGE. – It is the intent of Congress that the land exchange under this subsection

shall be completed not later than 16 months after the date of enactment of this Act."

47.     Section 1206(a)(2)(G) of the Act provides: "(G) RESERVATION OF

EASEMENTS- As a condition of the conveyance of the Federal land, the Secretary shall reserve

- - (i) a conservation easement to the Federal land to protect existing wetland, as identified by the

Oregon Department of State Lands, that allows equivalent wetland mitigation measures to

compensate for minor wetland encroachments necessary for the orderly development of the

Federal land[.]"

### FACTS

48.     President Barack Obama signed the Act into law on March 30, 2009.

49.     On June 8, 2009, Mt. Hood Meadows offered up its properties on the North side

in trade.

50.     On June 18, 2009, former Forest Supervisor Gary Larsen confirmed that Mt.

Hood Meadows had offered up its properties on the North side of Mt. Hood and that the Forest

Service had 13 months remaining to complete the trade.

51.     On August 2, 2010, Mt. Hood Meadows signed an agreement to initiate the trade

with the Forest Service (the "Agreement to Initiate"), which set forth a complete description of

the properties to be traded.  The Agreement to Initiate included a plan to value the properties,

including conducting a timber cruise of the forestland on both the North and South side of Mt.

Hood.

52.     The Agreement to Initiate provided for a reservation "on the wetlands as outlined

in Section 1206(a)(2)(G)(i) of the Omnibus Act."

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2727*

53.     The wetlands on the Government Camp property have been identified and delineated by Terra Science, Inc. and are 8.49 acres in size.  The Department of State Lands accepted the wetlands delineation prepared by Terra Science, Inc. in a letter dated October 11, 2007. Attached hereto as Exhibit 5.

54.     The Forest Service has prepared draft conservation easements and submitted the proposed easements to Mt. Hood Meadows.  The latest draft conservation easement that the Forest Service has prepared and transmitted to Mt. Hood Meadows has sought to protect lands outside of the delineated wetlands thereby reducing the marketability and value of the Government Camp properties.

55.     The Act specifies that the conservation easement is to apply "on the wetlands."

56.     The Forest Service draft conservation easement contains provisions greatly limiting and restricting minor wetland encroachments in a manner that is inconsistent with applicable law and goes beyond the direction in the Act.

57.     The Forest Service refusal to resolve the terms of the conservation easement consistent with the Act has resulted in excessive delay thereby rendering other required survey(s) and assessment(s) stale.

58.     Despite repeated requests from the Plaintiffs, Mt. Hood Meadows and members of the Oregon Congressional delegation to prepare a proper conservation easement and complete the Government Camp/Cooper Spur land exchange consistent with the Act, the Forest Service has not responded in a timely manner or provided adequate assurances regarding its plan to comply with the Act.  *See* Exhibits 3 and 4.

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2727*

## CLAIM FOR RELIEF

59.     Plaintiffs re-allege, as if fully set forth herein, each and every allegation in the preceding paragraphs.

60.     The Forest Service has a mandatory and nondiscretionary duty under the Act to complete the land trade "within 16 months" after the passage of the Act.

61.     The Forest Service has failed to meet the deadline.

62.     The Forest Service has not prepared a conservation easement that is consistent with the requirements of the Act.

63.     The Forest Service's failure constitutes agency action "unlawfully withheld" or "unreasonably delayed" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(1).  Alternatively, the Forest Service's failure to comply with the Act is arbitrary and capricious, an abuse of discretion, not in accordance with law, and a failure to observe the proper procedure under the APA, 5 U.S.C. § 706(2).

///

///

///

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2727*

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A.      Declare that Defendants violated the Act and the APA by failing to comply with the nondiscretionary duty to complete the Government Camp/Cooper Spur land exchange.

B.      Provide injunctive relief compelling Defendants to prepare and agree to a conservation easement consistent with the Act and to complete the Government Camp/Cooper Spur land exchange by a date certain at the earliest possible time;

C.      Retain continuing jurisdiction to enforce the injunctive relief requested herein;

D.      Award to Plaintiffs their costs of litigation, including reasonable attorneys' fees under the Equal Access to Justice Act or other applicable statute; and

E.      Provide such other relief as the Court deems just and proper.

DATED this 27th day of July 2015.

Respectfully submitted,

   /s/ Ralph O. Bloemers
Ralph O. Bloemers, OSB # 984172
Christopher G. Winter, OSB # 984355
Tel: (503) 525-2727
Tel: (503) 525-2725
Email: ralph@crag.org
Email: chris@crag.org
Crag Law Center
917 SW Oak St., Suite 417
Portland, Oregon 97205
Fax (503) 296-5454

*Attorneys for Plaintiffs*

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2727*

## Settlement Agreement

This Settlement Agreement is entered by and between the Parties identified in Section 1 of this Agreement, is made effective as of July 5, 2005, and represents the Parties' efforts to resolve longstanding conflicts involving a previous land trade on the north side of Mt. Hood, Meadows' use of all of its real property and related real estate interests on the north side of Mt. Hood and disputes related to the protection of the environment and quality of life on the north side of Mt. Hood and in Hood River County in a way that the Parties believe is beneficial to their individual and collective interests (the "Agreement"). The success of this Agreement depends on the actions of the Parties and on their respective, mutual work to demonstrate to others the value of the terms set forth in this Agreement. The Parties enter into this Agreement after their serious and considered conclusions about the merits of the proposed solution.

## Recitals

A.      This Agreement arises from a dispute between the parties stemming from a trade of land owned by Hood River County in the Upper Hood River Valley to Mt. Hood Meadows Oreg., Ltd. and associated proposals by Meadows and its affiliated entities to develop the private lands that were part of the land trade, additional private lands and public lands in and around the north side of Mt. Hood into a destination resort and expand the ski area at Cooper Spur.

B.      This Agreement contemplates an exchange of public real property interests for private real property interests. Because of the public interest involved in this Proposed Solution, the Parties have agreed upon a procedure designed to verify that the exchanged properties are of equal value – if the Exchange proceeds, both the substance and the process utilized in the Exchange will be open to public evaluation and input. One way that this Agreement assures the acceptability of the "equal value" of exchanged properties is that if any of the Parties decides not to proceed with the Exchange this Agreement can be terminated.

C.      This Agreement represents a culmination of extensive settlement negotiations, which were an effort to resolve even more extensive disputes between and involving these parties. It represents a mutual effort to proceed with compromised goals and outcomes, which results would not have been any party's unilateral choice. For instance, while Meadows anticipated the development of a destination resort on the north side of Mt. Hood, and had invested substantial time and resources in that vision, this Agreement envisions giving up that development vision in exchange for land in Government Camp. This Agreement envisions the permanent protection of the north side of Mt. Hood as part of a compromise and exchange, whereby Meadows acquires land that is zoned for development in Government Camp.

Exhibit 1 to Complaint - Page 1

## Agreement

The parties agree as follows:

1.    <u>The Parties</u>.  The parties to this Agreement are the Board of Commissioners of Hood River County ("HRC"), the Hood River Valley Residents Committee ("HRVRC"), Michael McCarthy ("McCarthy"), Mt. Hood Meadows, Oregon, Limited Partnership, Mt. Hood Meadows Development Corp., Meadows North LLC, Meadows Utilities, LLC, and North Face Inn (collectively, "Meadows")  The execution of this Agreement by Franklin Drake, Matthew Drake and David Riley only binds these individuals to sections 8(A)(3), 9, 21, 22, 23, 25 and 26, regardless of whether those sections specifically refer to those individuals.

2.    <u>Representations and Warranties.</u>

A.    Meadows represents and warrants that the names of the entities listed above constitute a full and complete list of the entities that own and operate the real estate and business interests on the North side of Mt. Hood as defined in Section 9, which real estate and business interests are the subject of this Agreement.

B.    Meadows represents and warrants that Franklin Drake is authorized to execute this Agreement on behalf of the various entities that comprise "Meadows" herein. HRVRC and the County represent and warrant that the signatories executing this Agreement on their respective behalves are fully authorized to execute this Agreement.

C.    Meadows represents and warrants that this Agreement shall be binding upon and inure to the benefit of any successors, assigns, executors, and administrators, to the extent set forth in paragraph 25.

D.    Meadows further warrants that if any controlling interest in any of the Meadows entities named herein, or all or substantially all of the assets of any Meadows entity named herein, is voluntarily transferred, the transfer documentation shall include a provision that binds the transferee.

E.    Meadows, David Riley, Franklin Drake, and Matthew Drake represent and warrant that they are the only individuals that are officers, managing members, and/or general partners of the Meadows entities listed above.

3.    <u>Parties' Representatives</u>.  This Agreement includes a number of steps in a lengthy process.  At many of those steps, one or more of the Parties hereto will be required to take action and make decisions related to the terms of the Agreement.  The following persons are authorized to transmit the parties' decisions regarding this Agreement: for HRC: David Meriwether, for HRVRC, Scott Franke, President for HRVRC: for McCarthy: Michael McCarthy, and for Meadows: David Riley.

4.    <u>Non-parties</u>.  Whether the goals of this Agreement are met will depend largely upon the opinions and actions of non-parties to this Agreement.  Those non-parties include the following: the members of the Cooper Spur Wild and Free Coalition ("CSWF"), the United

Exhibit 1 to Complaint - Page 2

States Forest Service ("USFS") and other organizations, their members and individuals in the communities of Mt. Hood.

5.　　The Land Trade Lawsuits. The Parties are named in two lawsuits, both entitled "Hood River Valley Residents Committee and Michael McCarthy v. Board of Commissioners of Hood River County and Mt. Hood Meadows, Oregon, Ltd.," Hood River County Circuit Court Case Nos. 020029 CC and 020055 CC, Oregon Court of Appeals Case Nos. A118889 and A124051 (the "Lawsuits"). The Parties agree that the obligations set forth herein are conditioned upon the Oregon Court of Appeals and the Oregon Supreme Court either abating the proceedings or extending the time within which the parties are required to file any additional pleadings, petitions or motions in the Lawsuits. Until the completion of the Exchange, if any party determines that the manner in which the Lawsuits are abated or delayed is inadequate to meet their needs, the obligations set forth herein will not bind any party.

6.　　The Water Rights Protest. Meadows, HRVRC, the Friends of Mt. Hood, WaterWatch of Oregon and the Northwest Environmental Defense Center (the "Protestants") are parties to a water rights protest over a water right permit that is the property of Meadows Utilities, LLC (the "Protest"). The Protestants have filed a notice of intent to appeal the decision of Oregon Water Resources Department. The Parties agree that the obligations set forth herein are conditioned upon the Oregon Court of Appeals extending the time within which the parties to the Protest are required to file any additional pleadings, petitions or motions. Until the completion of the Exchange, if any party determines that the manner in which the Protest is abated or delayed is inadequate to meet their needs, the obligations set forth in this Agreement will not bind any party. As the Parties work to achieve the Proposed Solution, Meadows shall not take any action on the permit without first providing notice to HRVRC and Mike McCarthy because action on the permit is not required until October 1, 2005.

7.　　The Properties. This Agreement involves a variety of parcels of property in Hood River County and Clackamas County, Oregon. The properties are generally defined as follows, and are specifically defined on Exhibits A-1 and A-2, attached hereto.

　　　　a.　　Prior to August 2001, Meadows acquired approximately 155.25 acres of property in Hood River County in and around the Inn at Cooper Spur. The Inn at Cooper Spur and its associated buildings are located on a 2.86 acre parcel of commercially zoned land ("the 2.86 Acre Parcel"). The remainder of the land is separated into three parcels (tax lots 102, 103, 401), all of which are zoned forestland. The Inn at Cooper Spur includes not just the underlying real property and the improvements thereon, but also the business associated with those improvements, in the form of the 16 rental units and a restaurant, as well as the associated inventory and assets. This 155.25 acres of property, including the 2.86 Acre Parcel, and associated improvements are referred to as "the Dillard Property."

　　　　b.　　Also prior to August 2001, Meadows owned (and still owns) 73.9 acres west of Dog River. That property is referred to as "the Dog River Property."

Exhibit 1 to Complaint - Page 3

FINAL SETTLEMENT AGREEMENT
Page 4                                                6/28/2005

c.      In August 2001, HRC and Meadows entered into an agreement to
exchange property. Over protest from the HRVRC and McCarthy, the deeds
effectuating that exchange were executed and recorded in February, 2002. In that
exchange, Meadows transferred to HRC approximately 775 acres ("the County
Exchange Property"), and HRC transferred to Meadows approximately 620 acres
("the Meadows Exchange Property"), along with an equalization payment of
approximately 1.2 million dollars paid by HRC to Meadows. Those properties are
the subject of the Lawsuits.

d.      Meadows has a federal permit for skiing on the north side of Mt. Hood.
This permit and associated buildings, improvements, business, inventory and
assets related to that business are referred to herein as "the Cooper Spur Ski
Area."

e.      The Crystal Springs Water District and the State of Oregon have identified
boundaries of the zone of contribution to the Crystal Springs Water District.
While the zone of contribution covers a variety of property ownerships, and a
variety of zoning designations, that zone of contribution, as it is presently
identified, is generally referred to as "the Crystal Springs Watershed."

f.      The USFS owns approximately 120 acres of forestland in Government
Camp, comprised of one 80-acre parcel and one 40-acre parcel, both of which
have been zoned by Clackamas County for low-density residential development
and are within the Government Camp revitalization plan. These parcels are
collectively referred to as "the Government Camp Property."

8.      The Proposed Solution. This Agreement seeks to permanently protect the north
side of Mt. Hood including the Cooper Spur Ski Area, the Dillard Property, the Meadows
Exchange Property, portions of the Crystal Springs Watershed, and certain adjacent lands located
in the vicinity of the Crystal Springs Watershed from expansion and development in a manner
consistent with the vision for this area that HRVRC shares with the members of the CSWF
Coalition, while allowing Meadows to obtain other property in Government Camp, in exchange
for its interests on the north east side of Mt. Hood (the "Proposed Solution"). The Parties
recognize that the material terms, obligations, covenants and restrictions, as well as their
enforceability, are critical to the overall acceptability of this Agreement to all of the Parties.

The Proposed Solution shall include the following:

A.      For purposes of facilitating a compromise settlement of the disputes
discussion herein, Meadows shall propose to complete an exchange of real property interests,
business interests, and permit rights with the USFS ("the Exchange"). While the Exchange must
be approved by the USFS and/or Congress, the parties to this Agreement intend to work in good
faith to accomplish the Exchange, which would result in the following transfers and/or
limitations on property rights, all of which must occur as part of the Proposed Solution:

(1)     Meadows would transfer the Dillard Property, the Meadows
Exchange Property, and the Cooper Spur Ski Area to the USFS.

Exhibit 1 to Complaint - Page 4

   (2) The USFS would transfer all or part of the Government Camp Properties to Meadows based upon full fair market value appraisals and equal value. If the value of Meadows' interests is greater than the value of the Government Camp Properties, then the Parties may also mutually agree to the transfer of additional real property and/or an equalization payment to Meadows from the U.S. Government within the bounds of any limitations on equalization payments set by federal law. If the value of Meadows' interests are less than the value of the Government Camp Properties, then the acreage Meadows may receive shall be accordingly reduced and there shall be no equalization payment to make up the difference from Meadows to the USFS. Meadows, HRVRC and McCarthy shall have the right to not go forward with the Proposed Solution, as provided in Section 18.

   (3) Approximately 1350 acres of undeveloped property within the Cooper Spur Ski Area, adjacent lands within the Cloud Cap Tilly Jane Special Interest Area and other adjacent lands shall be legislatively designated as Wilderness, as identified on Exhibit A-2. The remaining, developed 50 acres of the current Cooper Spur Ski Area may be expanded by up to 20 acres, after an opportunity for input from interested members of the public pursuant to the requirements of federal law. The Cooper Spur Ski Area, including all improvements on the public lands and the going concern, and inventory and assets, shall be owned by the USFS after the Exchange is completed. Meadows agrees that it shall never lease, manage, or have any ownership interest in the Cooper Spur Ski Area and/or the Inn at Cooper Spur, or the improvements located thereon, with the exception of typical and ordinary use of the Cooper Spur Ski Area or the Inn at Cooper Spur as a typical and ordinary customer. Use as a typical and ordinary customer does not include or allow any resale of goods or services purchased, to the public.

   By agreeing to bind themselves to this Section 8(A)(3), Franklin Drake, Matthew Drake and David Riley are agreeing only that upon completion of the Exchange, none of them will own an interest in, start, lead or invest in a business that acts in a manner from which Meadows is precluded from acting in this Section 8(A)(3).

   (4) Real property owned by USFS, a large portion of which is within the Crystal Springs Watershed but outside of the Cooper Spur Ski Area, shall be legislatively designated as Wilderness as set forth on Exhibit A-2 to the extent that the property meets the necessary requirements for a wilderness designation. Any of the identified USFS property not designated as Wilderness, within the Crystal Springs Watershed, shall be designated and congressionally withdrawn from the Mt. Hood National Forest Plan as an area that is reserved for watershed protection in a manner that is approved by the HRVRC and Mike McCarthy in their sole discretion and after consultation with the Crystal Springs Water District. The congressional designation shall cover the federal land in the Crystal Springs Zone of Contribution, but would not apply to the other owners of real property

Exhibit 1 to Complaint - Page 5

within the Crystal Springs Watershed. Rather, those owners' use of their property would be in accordance with applicable land use laws and regulations.

B.      The Parties shall pursue and effectuate the following terms, the timing of which shall occur either: (i) upon execution of this Agreement and as consideration for this Agreement, (ii) concurrently with the completion of the Exchange or (iii) immediately after the Release of the Lawsuits or completion of the Exchange, as set forth below. As used herein, "completion of the Exchange" shall mean execution and recording of deeds and other necessary transfer documentation.

(1)     Land Trade Ordinance. At the first regularly scheduled meeting of the HRC Board of Commissioners as soon as practicable after the execution of this Agreement but no later than 45 days after its execution, HRC agrees to provide notice as may be required and then consider the adoption and approval of a "Land Trade Ordinance" governing future trades of Hood River County forestland pursuant to ORS Ch. 275, which at a minimum shall contain the provisions set forth on the attached Exhibit B. By entering this Agreement, HRC is not agreeing to adopt the proposed draft Land Trade Ordinance; rather the Board of Commissioners of Hood River County is agreeing to consider such legislation at its next scheduled meeting. HRC shall consider the Land Trade Ordinance as consideration for the execution of this Agreement, whether the Proposed Solution is completed or not. The County acknowledges the HRVRC reserves the right to contest the ability of the County to make or receive equalization payments in an exchange of County forest land.

(2)     Watershed Mapping. At the first regularly scheduled meeting of the HRC Board of Commissioners as soon as practicable after completion of the Exchange, but no more than 60 days thereafter, HRC agrees to provide public notice as may be required and then consider the adoption and approval of a resolution regarding a "Watershed Mapping Process." The HRC shall undertake a process providing for the mapping of the watersheds within Hood River County as set forth on Exhibit C, after completion of the Exchange, as part of the consideration for this Agreement. Each water district shall be individually responsible for participating in the mapping process. HRC may or may not share the responsibility for creating and/or paying for any watershed delineation maps; however HRC shall be primarily responsible for a plan and formal requests that each water district map their respective zones of contribution. The parties shall also pursue federal funding for the watershed mapping process in the legislation that is part of the Proposed Solution. The mapping process is designed to protect the watersheds and retain those lands for watershed purposes.

(3)     Amendment of Hood River County's Economic Development Plan. Upon completion of the Exchange, HRC shall start a process to eliminate all references to destinations resorts in Hood River County.

(4)     North Side Vision/South Side Vision. Concurrent with the completion of the Exchange and ongoing thereafter, and in compromise consideration of the disputes resolved herein, Meadows and HRC agree to publicly support, with respect to the North side of Mt. Hood, the historic backcountry wilderness vision and appropriate restoration for the lands protected by the Proposed Solution that is shared by the HRVRC and members of the CSWF Coalition. In compromise consideration of the disputes resolved herein, HRVRC and

Exhibit 1 to Complaint - Page 6

**FINAL SETTLEMENT AGREEMENT**
Page 7                                                               6/28/2005

McCarthy agree not to oppose Meadows' development efforts within the current and/or future
boundaries of the unincorporated community of Government Camp. That support and non-
opposition, respectively, will be reflected in, and will only be required to consist of, issuing
agreed-upon statements, which the Parties will not thereafter contradict, unless this Agreement is
terminated pursuant to Section 18. Concurrently with completion of the Exchange, and with any
costs to be borne by HRVRC, Meadows shall transfer its rights in the domain name
www.friendsofcooperspur.com to HRVRC. Meadows shall maintain its rights to the website
until the transfer is made and bear all registration renewal costs until the transfer is made to
HRVRC. HRVRC shall provide a domain name transfer agreement within 14 days after the
parties agree upon the language in proposed legislation.

       (5)   The Lawsuits. Contemporaneously with completion of the
Exchange, HRVRC will dismiss the Lawsuits, with prejudice. Concurrent with the dismissal of
the Lawsuits, HRC will pay HRVRC and McCarthy costs and disbursements for the Writ of
Review case in the amount of $2,500.00. As part of the dismissal, Meadows will file a
satisfaction of the attorney fees awarded to Meadows in the Declaratory Judgment action,
Meadows will pay the HRVRC $4,000 for its attorney fees, costs and disbursements incurred in
the two lawsuits and the parties shall agree to remove the protective order's application to the
destination resort development map that was covered by that order.

       (6)   Dog River Property Restrictions. Contemporaneously with
completion of the Exchange, Meadows shall execute and record the necessary documents to
place a restriction on the Dog River Property that the parties intend to perpetually prohibit the
development of the Dog River property in a form that is mutually agreed to by all the parties.
That restriction shall only allow the holder of that property to make use of the Dog River
Property in a manner that is presently allowed under Goal 4, except as specified herein. A list of
allowed Goal 4 uses is attached as Exhibit D, and all currently allowed uses listed in the exhibit
are allowed by this agreement excepting the provisions under OAR 660-006-0025 (3)(n) and (q)
and excepting the provisions under OAR 660-006-0025 (4)(e), (p), (w) and (y). HRVRC and
McCarthy shall work with Meadows to agree on the legal documentation necessary to effectuate
the parties' intent. The restriction shall run with the land and bind future purchasers of the land
and be enforceable by HRVRC, Mike McCarthy and his successors and assigns, and/or by a
willing and able conservation easement holder. HRVRC and McCarthy agree to assist Meadows
in efforts to find a potential conservation buyer and conservation easement holder.

       Contingent upon completion of the Exchange, HRVRC and McCarthy shall assist
Meadows in its efforts to obtain the maximum possible benefit from the conservation approach
for the property, including identifying the fair market value of the Dog River Property when that
property is put to its highest and best use. Contingent upon completion of the Exchange,
HRVRC agrees to not oppose Meadows efforts to obtain the maximum possible benefit,
including any uses and value attributable to potential development beyond the uses allowed in
Goal 4 that seeks to provide Meadows with the best economic return and/or available tax
advantages possible.

       Specifically, contingent upon completion of the Exchange, HRVRC and McCarthy agree
to not oppose: (1) the approval of a lot of record dwelling on the Dog River Property; (2)
approval of all necessary utilities and related easements for the lot of record dwelling, including

Exhibit 1 to Complaint - Page 7

but not limited to power, telephone, Crystal Springs water connection, and a well; and (3) granting of a new road easement across Hood River County land from either Cooper Spur Road or Dog River Road. HRVRC's and McCarthy's assent to not oppose these needed approvals and the road easement would not be binding or made effective until the completion of the Exchange.

(7)    Protest. Contemporaneously with the completion of the Exchange, whether by legislation or through the administrative process, the parties shall request OWRD to enter in an order specifying the location of use of the water right as being within the 2.84 Acre Parcel (zoned for commercial uses). Contemporaneously with the completion of the Exchange, the parties agree to enter in a stipulated dismissal that is without prejudice to HRVRC's and Friends of Mt. Hood's rights to pursue the unresolved issues in the water right in the future. Each party shall bear their own fees, costs and expenses incurred as part of the Protest.

9.    Divestiture of Ownership Interests. Upon the completion of the Exchange, and thereafter, Meadows shall not purchase, lease, manage, operate, or acquire any ownership interest in any real property, or business or other interest located on the North side of Mt. Hood, other than the Dog River Property, on the North side of Mt. Hood, with the exception of transactions where Meadows acts as a typical and ordinary customer, and with the exception of Meadows' possible purchase of property and/or business interests known as the Frost Property and the Elliot Glacier Public House specifically described in Exhibit E. For purposes of this section, Meadows acts as a typical and ordinary customer when it enters into arms length transactions with purveyors of goods or services, to purchase such goods and/or services, where the goods or services so provided are regularly and frequently sold to individual members of the general public, and such transaction occurs in the regular course of the purveyors, except that Meadows may not purchase goods or services for resale. For purposes of this Section 9 and Section 2, the North side of Mt. Hood means all the public and private lands between a northernmost point marked by an east-west line set at 45 degrees, 32 minutes and 15 seconds North Latitude on a United States Geological Survey map, and a southernmost point of an east-west line set at 45 degrees, 22 minutes and 24 seconds North Latitude on a United States Geological Survey map, running to the easternmost and westernmost edges of Hood River County, as more specifically shown on Exhibit E. In the event that Meadows violates this Section 9, upon receipt of written notice from HRVRC of the violation, Meadows shall have 30 days to provide objectively reasonable assurances that Meadows shall immediately divest itself of the property, business or other interest on the North side of Mt. Hood. After receiving notice from HRVRC, Meadows shall divest itself within 90 days and, if the assurances are not provided or divestiture does not occur, either HRVRC or McCarthy shall have the right to seek specific performance of this Section 9, and the prevailing party therein shall be entitled to recover reasonable attorney fees, costs and expenses, at trial and on appeal, for enforcing this Section 9, pursuant to Section 22, herein. If any claim in any suit or legal action to enforce this section 9, is rendered and/or adjudged moot due to Meadows' compliance with the original claim or demand, then HRVRC and McCarthy shall be the prevailing party(ies) for purposes of this section, with respect to such claim or demand.

By agreeing to bind themselves to this Section 9, Franklin Drake, Matthew Drake and David Riley are agreeing only that, upon completion of the Exchange, none of them will own an interest in, start, lead or invest in a business that acts in a manner from which Meadows is precluded from acting in this Section 9.

Exhibit 1 to Complaint - Page 8

10.    Party Support for the Proposed Solution.  The Parties agree that by entering into this Agreement, they expressly support the Proposed Solution as a compromise and resolution of their disputes. The Parties will jointly agree on all public statements regarding this Agreement. The Parties further agree that unless one of the parties terminates this Agreement, they will not take any action to oppose the Proposed Solution and/or Meadows' prospective development efforts in the current or future unincorporated community boundary of Government Camp in Clackamas County, Oregon, and that persons who serve as their respective board members, officers or directors shall not individually take any action to oppose the Proposed Solution and/or Meadows' prospective development efforts in the current or future unincorporated community boundary of Government Camp in Clackamas County, Oregon.  As used herein, a person does not "take any action to oppose" the Parties' efforts herein if that person individually remains neutral on any such issue.

11.    Non-Party Support for the Exchange.  The Parties will work together, in a manner that they find most productive, to educate others and encourage their support for the Proposed Solution.  More specifically, the Parties will expressly seek the support of the CSFW and its constituent members, Hood River County, Clackamas County, and other businesses, interest groups and individuals that are interested in the lands involved in this Agreement. The Parties will request that support for the Proposed Solution be expressed in writing, so that the parties can educate the public and advocate in favor of the Proposed Solution.

12.    Congressional Support for the Exchange.  As the Parties obtain Non-Party support for the Proposed Solution, the Parties shall work to obtain Congressional support for the Proposed Solution, starting with the seven members of the Oregon delegation, either in the form of Congressional legislation and appropriation directing that the Proposed Solution be completed, or in the form of Congressional support for administrative approval for the Proposed Solution.  The Congressional Support required for the Proposed Solution is approval of the Proposed Solution, funding for all administrative aspects of the Exchange, including (but not limited to) formal appraisals, NEPA/EIS evaluations, and any other out-of-pocket expenses associated with the Proposed Solution, and any and all actions to accomplish the objectives of the Proposed Solution.

13.    Survey(s).  When Meadows determines that there is adequate Non-Party and Congressional Support for the Exchange, Meadows shall, at its expense, commission any boundary surveys and maps necessary to complete a legal description, for purposes of completing appraisals of the properties that are the subject of the Exchange.  Meadows may, in its discretion, commission any such surveys before determining that there is adequate support to move forward with the Exchange.

14.    Appraisals.  When the Parties mutually agree that Congressional Support for the Proposed Solution is adequate to move forward, HRVRC, McCarthy and Meadows shall retain an appraiser mutually acceptable to all Parties ("Appraiser") to conduct appraisals of the Dillard Property, the Meadows Exchange Property, the Government Camp Property, and the value of the Cooper Spur Ski Area.  For the purposes of the Exchange, the parties have agreed that the Appraiser shall conduct the appraisals and fix the values of those properties as of the date of the "self-contained Appraisal Report," and that any valuations or appraisals of the properties, related

Exhibit 1 to Complaint - Page 9

to the Exchange, shall fix the values of the properties as of the date of the "self-contained Appraisal Report," as defined herein. The parties have mutually agreed to retain Steve Hall, MAI to conduct these appraisals for the HRVRC, McCarthy and Meadows, after this Settlement Agreement is executed and announced to the public. Prior to executing this Agreement, Meadows retained Mr. Hall to collect preliminary data and other information on the value of the properties to be traded as part of the proposed solution. The Appraiser may retain a timber cruiser to conduct a timber cruise of the Government Camp Property and the Dillard Property, and to review and update the prior timber cruises of the Meadows Exchange Property, as directed by the Appraiser. In the event an appraiser or appraisers selected is not available to perform the work, the Parties shall select a substitute appraiser which substitute shall require mutual agreement of all the parties. The timber cruiser's report shall be included in the real property appraisal, which shall be delivered to Meadows by the Appraiser. Meadows shall pay for the appraisal, and the Parties' respective rights to review and approve the appraisal shall be limited to the rights specifically set forth in this Agreement. Meadows shall be allowed to first review the appraisal of the Government Camp Property before ordering the appraisal of the real property and business interests to be exchanged for the Government Camp Property. The appraisal(s) shall be prepared for the benefit of Meadows and HRVRC pursuant to the following guidelines:

A.    HRVRC, Meadows and McCarthy have consulted with Steve Hall, the appraiser selected to do the work. Prior to the self-contained appraisal work being performed, HRVRC, Meadows and HRC shall each designate one or more (but no more than three) representatives to consult further with the appraiser(s), if necessary, to discuss an appropriate scope and methodology for the self-contained Appraisal Report that is to be prepared for the parties pursuant to this Agreement.

B.    During the course of the appraisals, HRVRC and HRC shall be informed at least 7 days in advance of any meetings and discussions between Meadows and the appraiser(s) and shall be allowed to have a designated representative, Mr. Bob Bancroft or another designated appraiser (the "HRVRC Review Designee"), present at those meetings, but shall not be allowed to have representatives present when any of the appraisers are reviewing or evaluating proprietary and confidential business records or information of Meadows, which review and evaluation may include conversations between the Appraiser and David Riley. In addition, HRVRC and HRC will not be entitled to review any information or documents designated by Meadows as being confidential, but as described herein, HRVRC and HRC shall be entitled to review the detailed summary of such proprietary and confidential information, as that information is subject to disclosure to HRVRC and HRC under the terms described in Section D, herein. These restrictions on the use of proprietary and confidential information are designed solely to protect Meadows proprietary and confidential information in the event that the Proposed Solution is not accomplished. In the event that the Appraisal Report is provided to HRVRC and McCarthy, and then made public as part of the effort to complete the Exchange, then the confidentiality obligations in this Section 14 shall be terminated and no longer in effect with respect to any information presented in the Appraisal Report. The confidential information that is not in the Appraisal Report shall remain confidential.

C.    With respect to the substantive work to be performed during the appraisal process, the Parties agree to meet with appraisers to determine the scope and design of the appraisal process. With respect to the substantive work to be work to be performed during the

Exhibit 1 to Complaint - Page 10

## FINAL SETTLEMENT AGREEMENT
### Page 11                                    6/28/2005

appraisal process, the Parties acknowledge that this Agreement is part of an effort to compromise and settle disputes. The Appraiser should consider applicable federal, state, and local laws, regulations, and procedures to determine the potential development value and highest and best use of the properties, without influence on the process by the Parties.

      D.    Meadows shall have the right to the first review of the completed appraisals for the purpose of allowing Meadows to conduct an initial review in a manner that preserves Meadows' proprietary and confidential business information if the Proposed Solution does not proceed. HRC, HRVRC and McCarthy shall be notified of the date that the appraisal(s) are provided to Meadows by the appraiser and Meadows shall have 20 days to review each appraisal. If Meadows identifies what it considers to be an error in an appraisal, Meadows shall notify the HRC and HRVRC of that error prior to contacting the appraisers. If the Parties agree that there is an error or errors, the Parties shall identify those errors in writing and jointly provide the error or errors to the appraiser and request that the errors be rectified prior to the issuance of the appraisal(s) to Meadows for another review. If there is an error, then after the Appraisal Report is corrected, Meadows shall have an additional 10 days to review the Appraisal Report, and shall determine whether if, in Meadows' sole discretion, it is appropriate to go forward with the Proposed Solution. Meadows shall have no more than 20 days from the date that the Appraisal Report is received by Meadows to make a determination whether it will proceed with the exchange, unless there is a correction of an error or errors as set forth in subsection D above. If Meadows does not communicate its determination to the Parties within those prescribed timelines, Meadows shall immediately provide the appraisal(s) to the HRVRC and Mr. McCarthy. During this process, Meadows shall continue to have the rights of termination set forth in Section 18, herein.

      E.    If Meadows decides, after reviewing the Appraisal Report, to not proceed with the Exchange, the Appraisal Report shall remain Meadows' sole property and shall be maintained strictly confidential. The Parties agree that in the event that Meadows terminates this Agreement after reviewing the Appraisal Report that no Party other than Meadows shall have any right, title or legal interest in the Appraisal Report, and no Party will seek its production in any legal proceeding. Notwithstanding any other provision of this Agreement, if the Exchange is not completed, the Parties agree that none of them shall use, refer to, introduce into evidence or otherwise attempt to utilize in any fashion the Appraisal Report or any part thereof, in any litigation or public proceeding.

      F.    If Meadows' decision is to proceed with the Exchange, then the appraisal(s) shall be provided to HRVRC and Mike McCarthy. HRVRC and McCarthy shall have 14 days from the receipt of the report to review the appraisal(s) and to determine whether or not to proceed with the Exchange. In the event that HRVRC wishes to review the underlying information upon which the appraisal(s) is based, including Meadows confidential, proprietary or other business information or data provided to the appraisers, then HRVRC shall be entitled to request that a designee have access to all the underlying information. If such a request is made to Meadows, Meadows shall have the right to refuse to respond to the request, in whole or in part. With respect to any information provided by Meadows to HRVRC under this section, that information shall be reviewed by HRVRC's designee, for purposes of determining whether the appraisal(s) accurately reflect the underlying data reviewed. As a precondition to the review of the information by HRVRC's designee, HRVRC's designee shall execute a confidentiality

Exhibit 1 to Complaint - Page 11

**FINAL SETTLEMENT AGREEMENT**
Page 12                                                    6/28/2005

provision, precluding him or her from keeping, copying, or sharing the information with any other person or entity. Upon completion of his review of the information, which review must occur in Meadows' offices, the original and all copies of the information and documents shall be returned to Meadows, and shall not be taken by HRVRC's designee, and any documents he or she has prepared that would reveal the contents of the data so provided shall be destroyed.

15. Legislative vs. Administrative Exchange. After the Parties have acknowledged an adequate level of Congressional support for the Exchange, the Parties shall agree on whether the Proposed Solution will proceed as a Legislative Exchange or an Administrative Exchange. The Parties recognize that HRVRC and Mike McCarthy are likely to agree to proceed with the Proposed Solution if there is legislation that provides for the permanent protection for the public lands on the North side of Mt. Hood through congressionally designated wilderness protection of the undeveloped part of the Cooper Spur Ski Area, congressional withdrawal of the Crystal Springs Watershed and certain adjacent lands as set forth on Exhibit A-2. If the Parties are not able to agree on which course to take, this Agreement will terminate.

16. Bill Drafting. After the parties have acknowledged an adequate level of support for the Proposed Solution, and if the parties agree to pursue a Legislative Exchange, the parties shall either request that legislative counsel draft a bill to approve the Exchange or the Parties shall draft the proposed legislation approving the Exchange (the "Bill"). In either case, the Parties shall have the right to review and approve the Bill, in both form and substance, in their sole discretion. The Bill, as drafted, shall provide that the Proposed Solution between Meadows and the USFS shall be a like kind exchange for purposes of calculation of federal and state taxation. If the legislation as drafted, introduced, amended, approved and/or adopted is not acceptable to any of the parties, in their sole discretion, the parties may terminate this Agreement.

17. Gauging Success. On or around the 90th day after execution of this Agreement, and every 90 days thereafter, the Parties shall confer to assess the status of the Proposed Solution.

18. Termination; Dispute Resolution. Prior to the completion of the Exchange, any party may terminate this Agreement after giving 30 days' written notice. After the completion of the Exchange, this Agreement shall become irrevocable, binding and fully enforceable by any Party hereto. In the event that a Party provides notice of Termination, as set forth herein, during that 30-day period, all other timelines set forth in this Agreement shall be tolled. In the event of a termination, during that 30-day period, the parties agree that they shall participate, in good faith, in a mediation of the issue or issues that caused the notice of termination to be issued, in an effort to resolve any disputes and continue with the purpose and intent of this Agreement. The Parties' expressed intent in requiring mediation of any such decision or conflict is to preserve their mutual goals, if at all possible. Nonetheless, the Parties acknowledge and agree that until the completion of the Exchange any Party hereto, for any reason, may terminate this Agreement subject to this Dispute Resolution provision. After the completion of the Exchange, the parties may not terminate this Agreement. The Parties also anticipate that the services of the mediator, Robert Fisher, may be helpful to the parties in resolving any disputes that may or may not involve a potential termination. Therefore, any Party may request the services of the mediator at any time through the completion of the exchange. In any case where the Mediator is requested

Exhibit 1 to Complaint - Page 12

FINAL SETTLEMENT AGREEMENT
Page 13                                                        6/28/2005

by the Parties, the Parties agree to share the costs of Mediator between them in a manner they agree upon.

19.    Potential Future Mediation. If for any reason the Exchange fails or any Party "opts out" or terminates this Agreement, then the Parties agree that they shall enter into further mediation, with the assistance of a mediator, if desired, to attempt to settle the issues that are the subject of this Agreement. At any future mediation, the Parties agree to explore alternative settlements for resolving the issues, including, but not limited to a conservation easement, a change in development activities and other options proposed by any Party. No party is bound to accept any other option; instead the parties will need to accept any other option in their sole discretion and in writing prior to being bound.

20.    Public Statements. This Agreement was entered into after a lengthy, confidential mediation. Prior to the preparation of this Agreement, the Parties agreed to share the results of the mediation with certain non-parties which necessarily required explanation of the process and the substance of the mediation. While the Parties requested that non-parties keep the results in confidence to allow the Parties to proceed with finalizing this agreement, the Parties recognized that the results of the mediation were no longer confidential. Nonetheless, the Parties shall not describe or characterize the position of any other party in discussions with the media, except as the parties agree upon. The Parties shall not seek to place blame on any other party for any reason in public statements or in discussions with the media. In their efforts to educate the broader public and their allies, in their statements, the Parties shall focus on the results of the mediation, rather than the details of any mediation discussions. In an effort to ensure full public understanding of the Proposed Solution and maintain a good working relationship, the Parties will agree upon the contents of public statements and press releases that describe the Proposed Solution and the other terms in this Agreement.

21.    No Admission of Liability. This Agreement represents the culmination of extensive settlement negotiations, which were an effort to resolve even more extensive disputes between and involving the Parties. If any aspect of the Parties' negotiations, or the result of those negotiations, could be used against the Parties in any public, administrative or judicial proceeding, the Parties would not likely execute this Agreement. Therefore, the Parties agree that neither the contents nor the terms of this Agreement, nor the contents of their negotiations leading up to this Agreement, may be used in any public, administrative or judicial proceeding, except for a proceeding which involves or relates to the enforcement, interpretation, or otherwise relevant description of the specific terms of this Agreement.

22.    Venue. The Parties agree that the only allowed venue for judicial resolution of any dispute about this Agreement is the Circuit Court of Hood River County.

23.    Enforcement. The Parties hereby expressly agree and acknowledge that the rights, duties and obligations imposed by this Agreement may be specifically enforced by Court order, there being no reasonable method for ascertaining the monetary damages that might be suffered by one or more of the Parties, if another party breaches any provision of this Agreement. The Parties agree that the covenants and obligations in this Agreement are part of a series of covenants and obligations. If in any judicial proceeding a court refuses to enforce all of the separate covenants included in this Agreement, any unenforceable covenant will be deemed

Exhibit 1 to Complaint - Page 13

**FINAL SETTLEMENT AGREEMENT**
**Page 14**                                      **6/28/2005**

eliminated from the provisions of this Agreement for the purposes of such proceeding to the extent necessary to allow the remaining covenants and obligations to be enforced in such proceeding.

24.     Authorization.  Meadows, HRVRC, McCarthy and HRC have taken all the necessary action to authorize the execution, delivery and performance of this Agreement. HRVRC, Meadows, McCarthy and HRC have full power and authority to enter into this Agreement and carry out the terms hereof, and this Agreement is a valid and binding obligation enforceable in accordance with its terms.

25.     Successors.  The Parties agree that this Agreement is intended to bind their respective successors, assigns, executors, and/or administrators, to the extent that any such successor, assign, executor, or administrator owns or otherwise controls a controlling interest in any of the named entities, or owns all or substantially all of the assets of any of the named entities, whether that ownership interest in the entities or assets was acquired or obtained by merger, acquisition, gift, inheritance, or other transfer.

Exhibit 1 to Complaint - Page 14

**FINAL SETTLEMENT AGREEMENT**
**Page 15**                                          6/28/2005

    26.    <u>Integration Clause.</u>  The Parties agree that this Agreement and their Mediation Agreement constitute the entire written understanding of their respective obligations. This Agreement modifies the Mediation Agreement, which the Parties agree is no longer confidential, and to the extent that the Mediation Agreement is inconsistent with this Agreement, this Agreement shall control. No prior oral or written communications, other than those in the Mediation Agreement, whether electronic or otherwise recorded, shall be considered to be part of this Agreement. This Agreement may only be modified in writing by mutual agreement of the Parties hereto.

    It is so agreed.

| | |
|---|---|
| Board of Commissioners of Hood River County | Mt. Hood Meadows Oregon, Limited Partnership |
| By: _____ | By: Mt. Hood Meadows Development Corp. |
| Its: _____ | By: _____ |
| | Its: _____PRES_____ |
| Hood River Valley Residents Committee | Mt. Hood Meadows Development Corp |
| By: _____ | By: _____ |
| Its: ____PRESIDENT____ | Its: _____PRES_____ |
| | Meadows North LLC |
| | By: Mt. Hood Meadows Development Corp. |
| | Its: Managing Member |
| Michael McCarthy | By: _____ |
| Michael McCarthy | Its: _____PRES_____ |
| | North Face Inn LLC |
| | By: Mt. Hood Meadows Development Corp. |
| Franklin Drake | Its: Managing Member |
| Franklin Drake | By: _____ |
| | Its: _____PRES_____ |
| David Riley | Meadows Utilities, LLC |
| David Riley | By: Mt. Hood Meadows Development Corp. |
| | Its: Managing Member |
| Matthew Drake | By: _____ |
| Matthew Drake | Its: _____PRES_____ |

Exhibit 1 to Complaint - Page 15

Case 3:15-cv-01397-BR    Document 1    Filed 07/27/15    Page 32 of 72

Public Law 111–11
111th Congress

## An Act

To designate certain land as components of the National Wilderness Preservation System, to authorize certain programs and activities in the Department of the Interior and the Department of Agriculture, and for other purposes.

Mar. 30, 2009
[H.R. 146]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*,

**SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

Omnibus
Public Land
Management Act
of 2009.
16 USC 1 note.

(a) SHORT TITLE.—This Act may be cited as the "Omnibus Public Land Management Act of 2009".

(b) TABLE OF CONTENTS.—The table of contents of this Act is as follows:

Sec. 1. Short title; table of contents.

TITLE I—ADDITIONS TO THE NATIONAL WILDERNESS PRESERVATION SYSTEM

Subtitle A—Wild Monongahela Wilderness

Sec. 1001. Designation of wilderness, Monongahela National Forest, West Virginia.
Sec. 1002. Boundary adjustment, Laurel Fork South Wilderness, Monongahela National Forest.
Sec. 1003. Monongahela National Forest boundary confirmation.
Sec. 1004. Enhanced Trail Opportunities.

Subtitle B—Virginia Ridge and Valley Wilderness

Sec. 1101. Definitions.
Sec. 1102. Designation of additional National Forest System land in Jefferson National Forest as wilderness or a wilderness study area.
Sec. 1103. Designation of Kimberling Creek Potential Wilderness Area, Jefferson National Forest, Virginia.
Sec. 1104. Seng Mountain and Bear Creek Scenic Areas, Jefferson National Forest, Virginia.
Sec. 1105. Trail plan and development.
Sec. 1106. Maps and boundary descriptions.
Sec. 1107. Effective date.

Subtitle C—Mt. Hood Wilderness, Oregon

Sec. 1201. Definitions.
Sec. 1202. Designation of wilderness areas.
Sec. 1203. Designation of streams for wild and scenic river protection in the Mount Hood area.
Sec. 1204. Mount Hood National Recreation Area.
Sec. 1205. Protections for Crystal Springs, Upper Big Bottom, and Cultus Creek.
Sec. 1206. Land exchanges.
Sec. 1207. Tribal provisions; planning and studies.

Subtitle D—Copper Salmon Wilderness, Oregon

Sec. 1301. Designation of the Copper Salmon Wilderness.
Sec. 1302. Wild and Scenic River Designations, Elk River, Oregon.
Sec. 1303. Protection of tribal rights.

Subtitle E—Cascade-Siskiyou National Monument, Oregon

Sec. 1401. Definitions.

Exhibit 2 to Complaint - Page 1

123 STAT. 992          PUBLIC LAW 111–11—MAR. 30, 2009

Sec. 1402. Voluntary grazing lease donation program.
Sec. 1403. Box R Ranch land exchange.
Sec. 1404. Deerfield land exchange.
Sec. 1405. Soda Mountain Wilderness.
Sec. 1406. Effect.

Subtitle F—Owyhee Public Land Management

Sec. 1501. Definitions.
Sec. 1502. Owyhee Science Review and Conservation Center.
Sec. 1503. Wilderness areas.
Sec. 1504. Designation of wild and scenic rivers.
Sec. 1505. Land identified for disposal.
Sec. 1506. Tribal cultural resources.
Sec. 1507. Recreational travel management plans.
Sec. 1508. Authorization of appropriations.

Subtitle G—Sabinoso Wilderness, New Mexico

Sec. 1601. Definitions.
Sec. 1602. Designation of the Sabinoso Wilderness.

Subtitle H—Pictured Rocks National Lakeshore Wilderness

Sec. 1651. Definitions.
Sec. 1652. Designation of Beaver Basin Wilderness.
Sec. 1653. Administration.
Sec. 1654. Effect.

Subtitle I—Oregon Badlands Wilderness

Sec. 1701. Definitions.
Sec. 1702. Oregon Badlands Wilderness.
Sec. 1703. Release.
Sec. 1704. Land exchanges.
Sec. 1705. Protection of tribal treaty rights.

Subtitle J—Spring Basin Wilderness, Oregon

Sec. 1751. Definitions.
Sec. 1752. Spring Basin Wilderness.
Sec. 1753. Release.
Sec. 1754. Land exchanges.
Sec. 1755. Protection of tribal treaty rights.

Subtitle K—Eastern Sierra and Northern San Gabriel Wilderness, California

Sec. 1801. Definitions.
Sec. 1802. Designation of wilderness areas.
Sec. 1803. Administration of wilderness areas.
Sec. 1804. Release of wilderness study areas.
Sec. 1805. Designation of wild and scenic rivers.
Sec. 1806. Bridgeport Winter Recreation Area.
Sec. 1807. Management of area within Humboldt-Toiyabe National Forest.
Sec. 1808. Ancient Bristlecone Pine Forest.

Subtitle L—Riverside County Wilderness, California

Sec. 1851. Wilderness designation.
Sec. 1852. Wild and scenic river designations, Riverside County, California.
Sec. 1853. Additions and technical corrections to Santa Rosa and San Jacinto
          Mountains National Monument.

Subtitle M—Sequoia and Kings Canyon National Parks Wilderness, California

Sec. 1901. Definitions.
Sec. 1902. Designation of wilderness areas.
Sec. 1903. Administration of wilderness areas.
Sec. 1904. Authorization of appropriations.

Subtitle N—Rocky Mountain National Park Wilderness, Colorado

Sec. 1951. Definitions.
Sec. 1952. Rocky Mountain National Park Wilderness, Colorado.
Sec. 1953. Grand River Ditch and Colorado-Big Thompson projects.
Sec. 1954. East Shore Trail Area.
Sec. 1955. National forest area boundary adjustments.
Sec. 1956. Authority to lease Leiffer tract.

Exhibit 2 to Complaint - Page 2

PUBLIC LAW 111–11—MAR. 30, 2009          123 STAT. 993

Subtitle O—Washington County, Utah

Sec. 1971. Definitions.
Sec. 1972. Wilderness areas.
Sec. 1973. Zion National Park wilderness.
Sec. 1974. Red Cliffs National Conservation Area.
Sec. 1975. Beaver Dam Wash National Conservation Area.
Sec. 1976. Zion National Park wild and scenic river designation.
Sec. 1977. Washington County comprehensive travel and transportation management plan.
Sec. 1978. Land disposal and acquisition.
Sec. 1979. Management of priority biological areas.
Sec. 1980. Public purpose conveyances.
Sec. 1981. Conveyance of Dixie National Forest land.
Sec. 1982. Transfer of land into trust for Shivwits Band of Paiute Indians.
Sec. 1983. Authorization of appropriations.

TITLE II—BUREAU OF LAND MANAGEMENT AUTHORIZATIONS

Subtitle A—National Landscape Conservation System

Sec. 2001. Definitions.
Sec. 2002. Establishment of the National Landscape Conservation System.
Sec. 2003. Authorization of appropriations.

Subtitle B—Prehistoric Trackways National Monument

Sec. 2101. Findings.
Sec. 2102. Definitions.
Sec. 2103. Establishment.
Sec. 2104. Administration.
Sec. 2105. Authorization of appropriations.

Subtitle C—Fort Stanton-Snowy River Cave National Conservation Area

Sec. 2201. Definitions.
Sec. 2202. Establishment of the Fort Stanton-Snowy River Cave National Conservation Area.
Sec. 2203. Management of the Conservation Area.
Sec. 2204. Authorization of appropriations.

Subtitle D—Snake River Birds of Prey National Conservation Area

Sec. 2301. Snake River Birds of Prey National Conservation Area.

Subtitle E—Dominguez-Escalante National Conservation Area

Sec. 2401. Definitions.
Sec. 2402. Dominguez-Escalante National Conservation Area.
Sec. 2403. Dominguez Canyon Wilderness Area.
Sec. 2404. Maps and legal descriptions.
Sec. 2405. Management of Conservation Area and Wilderness.
Sec. 2406. Management plan.
Sec. 2407. Advisory council.
Sec. 2408. Authorization of appropriations.

Subtitle F—Rio Puerco Watershed Management Program

Sec. 2501. Rio Puerco Watershed Management Program.

Subtitle G—Land Conveyances and Exchanges

Sec. 2601. Carson City, Nevada, land conveyances.
Sec. 2602. Southern Nevada limited transition area conveyance.
Sec. 2603. Nevada Cancer Institute land conveyance.
Sec. 2604. Turnabout Ranch land conveyance, Utah.
Sec. 2605. Boy Scouts land exchange, Utah.
Sec. 2606. Douglas County, Washington, land conveyance.
Sec. 2607. Twin Falls, Idaho, land conveyance.
Sec. 2608. Sunrise Mountain Instant Study Area release, Nevada.
Sec. 2609. Park City, Utah, land conveyance.
Sec. 2610. Release of reversionary interest in certain lands in Reno, Nevada.
Sec. 2611. Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria.

TITLE III—FOREST SERVICE AUTHORIZATIONS

Subtitle A—Watershed Restoration and Enhancement

Sec. 3001. Watershed restoration and enhancement agreements.

Exhibit 2 to Complaint - Page 3

Subtitle B—Wildland Firefighter Safety

Sec. 3101. Wildland firefighter safety.

Subtitle C—Wyoming Range

Sec. 3201. Definitions.
Sec. 3202. Withdrawal of certain land in the Wyoming range.
Sec. 3203. Acceptance of the donation of valid existing mining or leasing rights in the Wyoming range.

Subtitle D—Land Conveyances and Exchanges

Sec. 3301. Land conveyance to City of Coffman Cove, Alaska.
Sec. 3302. Beaverhead-Deerlodge National Forest land conveyance, Montana.
Sec. 3303. Santa Fe National Forest; Pecos National Historical Park Land Exchange.
Sec. 3304. Santa Fe National Forest Land Conveyance, New Mexico.
Sec. 3305. Kittitas County, Washington, land conveyance.
Sec. 3306. Mammoth Community Water District use restrictions.
Sec. 3307. Land exchange, Wasatch-Cache National Forest, Utah.
Sec. 3308. Boundary adjustment, Frank Church River of No Return Wilderness.
Sec. 3309. Sandia pueblo land exchange technical amendment.

Subtitle E—Colorado Northern Front Range Study

Sec. 3401. Purpose.
Sec. 3402. Definitions.
Sec. 3403. Colorado Northern Front Range Mountain Backdrop Study.

TITLE IV—FOREST LANDSCAPE RESTORATION

Sec. 4001. Purpose.
Sec. 4002. Definitions.
Sec. 4003. Collaborative Forest Landscape Restoration Program.
Sec. 4004. Authorization of appropriations.

TITLE V—RIVERS AND TRAILS

Subtitle A—Additions to the National Wild and Scenic Rivers System

Sec. 5001. Fossil Creek, Arizona.
Sec. 5002. Snake River Headwaters, Wyoming.
Sec. 5003. Taunton River, Massachusetts.

Subtitle B—Wild and Scenic Rivers Studies

Sec. 5101. Missisquoi and Trout Rivers Study.

Subtitle C—Additions to the National Trails System

Sec. 5201. Arizona National Scenic Trail.
Sec. 5202. New England National Scenic Trail.
Sec. 5203. Ice Age Floods National Geologic Trail.
Sec. 5204. Washington-Rochambeau Revolutionary Route National Historic Trail.
Sec. 5205. Pacific Northwest National Scenic Trail.
Sec. 5206. Trail of Tears National Historic Trail.

Subtitle D—National Trail System Amendments

Sec. 5301. National Trails System willing seller authority.
Sec. 5302. Revision of feasibility and suitability studies of existing national historic trails.
Sec. 5303. Chisholm Trail and Great Western Trails Studies.

Subtitle E—Effect of Title

Sec. 5401. Effect.

TITLE VI—DEPARTMENT OF THE INTERIOR AUTHORIZATIONS

Subtitle A—Cooperative Watershed Management Program

Sec. 6001. Definitions.
Sec. 6002. Program.
Sec. 6003. Effect of subtitle.

Subtitle B—Competitive Status for Federal Employees in Alaska

Sec. 6101. Competitive status for certain Federal employees in the State of Alaska.

Subtitle C—Wolf Livestock Loss Demonstration Project

Sec. 6201. Definitions.

Exhibit 2 to Complaint - Page 4

Sec. 6202. Wolf compensation and prevention program.
Sec. 6203. Authorization of appropriations.

Subtitle D—Paleontological Resources Preservation

Sec. 6301. Definitions.
Sec. 6302. Management.
Sec. 6303. Public awareness and education program.
Sec. 6304. Collection of paleontological resources.
Sec. 6305. Curation of resources.
Sec. 6306. Prohibited acts; criminal penalties.
Sec. 6307. Civil penalties.
Sec. 6308. Rewards and forfeiture.
Sec. 6309. Confidentiality.
Sec. 6310. Regulations.
Sec. 6311. Savings provisions.
Sec. 6312. Authorization of appropriations.

Subtitle E—Izembek National Wildlife Refuge Land Exchange

Sec. 6401. Definitions.
Sec. 6402. Land exchange.
Sec. 6403. King Cove Road.
Sec. 6404. Administration of conveyed lands.
Sec. 6405. Failure to begin road construction.
Sec. 6406. Expiration of legislative authority.

TITLE VII—NATIONAL PARK SERVICE AUTHORIZATIONS

Subtitle A—Additions to the National Park System

Sec. 7001. Paterson Great Falls National Historical Park, New Jersey.
Sec. 7002. William Jefferson Clinton Birthplace Home National Historic Site.
Sec. 7003. River Raisin National Battlefield Park.

Subtitle B—Amendments to Existing Units of the National Park System

Sec. 7101. Funding for Keweenaw National Historical Park.
Sec. 7102. Location of visitor and administrative facilities for Weir Farm National
           Historic Site.
Sec. 7103. Little River Canyon National Preserve boundary expansion.
Sec. 7104. Hopewell Culture National Historical Park boundary expansion.
Sec. 7105. Jean Lafitte National Historical Park and Preserve boundary adjust-
           ment.
Sec. 7106. Minute Man National Historical Park.
Sec. 7107. Everglades National Park.
Sec. 7108. Kalaupapa National Historical Park.
Sec. 7109. Boston Harbor Islands National Recreation Area.
Sec. 7110. Thomas Edison National Historical Park, New Jersey.
Sec. 7111. Women's Rights National Historical Park.
Sec. 7112. Martin Van Buren National Historic Site.
Sec. 7113. Palo Alto Battlefield National Historical Park.
Sec. 7114. Abraham Lincoln Birthplace National Historical Park.
Sec. 7115. New River Gorge National River.
Sec. 7116. Technical corrections.
Sec. 7117. Dayton Aviation Heritage National Historical Park, Ohio.
Sec. 7118. Fort Davis National Historic Site.

Subtitle C—Special Resource Studies

Sec. 7201. Walnut Canyon study.
Sec. 7202. Tule Lake Segregation Center, California.
Sec. 7203. Estate Grange, St. Croix.
Sec. 7204. Harriet Beecher Stowe House, Maine.
Sec. 7205. Shepherdstown battlefield, West Virginia.
Sec. 7206. Green McAdoo School, Tennessee.
Sec. 7207. Harry S Truman Birthplace, Missouri.
Sec. 7208. Battle of Matewan special resource study.
Sec. 7209. Butterfield Overland Trail.
Sec. 7210. Cold War sites theme study.
Sec. 7211. Battle of Camden, South Carolina.
Sec. 7212. Fort San Gerónimo, Puerto Rico.

Subtitle D—Program Authorizations

Sec. 7301. American Battlefield Protection Program.

Exhibit 2 to Complaint - Page 5

Sec. 7302. Preserve America Program.
Sec. 7303. Save America's Treasures Program.
Sec. 7304. Route 66 Corridor Preservation Program.
Sec. 7305. National Cave and Karst Research Institute.

Subtitle E—Advisory Commissions

Sec. 7401. Na Hoa Pili O Kaloko-Honokohau Advisory Commission.
Sec. 7402. Cape Cod National Seashore Advisory Commission.
Sec. 7403. Concessions Management Advisory Board.
Sec. 7404. St. Augustine 450th Commemoration Commission.

TITLE VIII—NATIONAL HERITAGE AREAS

Subtitle A—Designation of National Heritage Areas

Sec. 8001. Sangre de Cristo National Heritage Area, Colorado.
Sec. 8002. Cache La Poudre River National Heritage Area, Colorado.
Sec. 8003. South Park National Heritage Area, Colorado.
Sec. 8004. Northern Plains National Heritage Area, North Dakota.
Sec. 8005. Baltimore National Heritage Area, Maryland.
Sec. 8006. Freedom's Way National Heritage Area, Massachusetts and New Hampshire.
Sec. 8007. Mississippi Hills National Heritage Area.
Sec. 8008. Mississippi Delta National Heritage Area.
Sec. 8009. Muscle Shoals National Heritage Area, Alabama.
Sec. 8010. Kenai Mountains-Turnagain Arm National Heritage Area, Alaska.

Subtitle B—Studies

Sec. 8101. Chattahoochee Trace, Alabama and Georgia.
Sec. 8102. Northern Neck, Virginia.

Subtitle C—Amendments Relating to National Heritage Corridors

Sec. 8201. Quinebaug and Shetucket Rivers Valley National Heritage Corridor.
Sec. 8202. Delaware And Lehigh National Heritage Corridor.
Sec. 8203. Erie Canalway National Heritage Corridor.
Sec. 8204. John H. Chafee Blackstone River Valley National Heritage Corridor.

Subtitle D—Effect of Title

Sec. 8301. Effect on access for recreational activities.

TITLE IX—BUREAU OF RECLAMATION AUTHORIZATIONS

Subtitle A—Feasibility Studies

Sec. 9001. Snake, Boise, and Payette River systems, Idaho.
Sec. 9002. Sierra Vista Subwatershed, Arizona.
Sec. 9003. San Diego Intertie, California.

Subtitle B—Project Authorizations

Sec. 9101. Tumalo Irrigation District Water Conservation Project, Oregon.
Sec. 9102. Madera Water Supply Enhancement Project, California.
Sec. 9103. Eastern New Mexico Rural Water System project, New Mexico.
Sec. 9104. Rancho California Water District project, California.
Sec. 9105. Jackson Gulch Rehabilitation Project, Colorado.
Sec. 9106. Rio Grande Pueblos, New Mexico.
Sec. 9107. Upper Colorado River endangered fish programs.
Sec. 9108. Santa Margarita River, California.
Sec. 9109. Elsinore Valley Municipal Water District.
Sec. 9110. North Bay Water Reuse Authority.
Sec. 9111. Prado Basin Natural Treatment System Project, California.
Sec. 9112. Bunker Hill Groundwater Basin, California.
Sec. 9113. GREAT Project, California.
Sec. 9114. Yucaipa Valley Water District, California.
Sec. 9115. Arkansas Valley Conduit, Colorado.

Subtitle C—Title Transfers and Clarifications

Sec. 9201. Transfer of McGee Creek pipeline and facilities.
Sec. 9202. Albuquerque Biological Park, New Mexico, title clarification.
Sec. 9203. Goleta Water District Water Distribution System, California.

Subtitle D—San Gabriel Basin Restoration Fund

Sec. 9301. Restoration Fund.

Exhibit 2 to Complaint - Page 6

PUBLIC LAW 111–11—MAR. 30, 2009          123 STAT. 997

Subtitle E—Lower Colorado River Multi-Species Conservation Program

Sec. 9401. Definitions.
Sec. 9402. Implementation and water accounting.
Sec. 9403. Enforceability of program documents.
Sec. 9404. Authorization of appropriations.

Subtitle F—Secure Water

Sec. 9501. Findings.
Sec. 9502. Definitions.
Sec. 9503. Reclamation climate change and water program.
Sec. 9504. Water management improvement.
Sec. 9505. Hydroelectric power assessment.
Sec. 9506. Climate change and water intragovernmental panel.
Sec. 9507. Water data enhancement by United States Geological Survey.
Sec. 9508. National water availability and use assessment program.
Sec. 9509. Research agreement authority.
Sec. 9510. Effect.

Subtitle G—Aging Infrastructure

Sec. 9601. Definitions.
Sec. 9602. Guidelines and inspection of project facilities and technical assistance to
           transferred works operating entities.
Sec. 9603. Extraordinary operation and maintenance work performed by the Sec-
           retary.
Sec. 9604. Relationship to Twenty-First Century Water Works Act.
Sec. 9605. Authorization of appropriations.

TITLE X—WATER SETTLEMENTS

Subtitle A—San Joaquin River Restoration Settlement

PART I—SAN JOAQUIN RIVER RESTORATION SETTLEMENT ACT

Sec. 10001. Short title.
Sec. 10002. Purpose.
Sec. 10003. Definitions.
Sec. 10004. Implementation of settlement.
Sec. 10005. Acquisition and disposal of property; title to facilities.
Sec. 10006. Compliance with applicable law.
Sec. 10007. Compliance with Central Valley Project Improvement Act.
Sec. 10008. No private right of action.
Sec. 10009. Appropriations; Settlement Fund.
Sec. 10010. Repayment contracts and acceleration of repayment of construction
            costs.
Sec. 10011. California Central Valley Spring Run Chinook salmon.

PART II—STUDY TO DEVELOP WATER PLAN; REPORT

Sec. 10101. Study to develop water plan; report.

PART III—FRIANT DIVISION IMPROVEMENTS

Sec. 10201. Federal facility improvements.
Sec. 10202. Financial assistance for local projects.
Sec. 10203. Authorization of appropriations.

Subtitle B—Northwestern New Mexico Rural Water Projects

Sec. 10301. Short title.
Sec. 10302. Definitions.
Sec. 10303. Compliance with environmental laws.
Sec. 10304. No reallocation of costs.
Sec. 10305. Interest rate.

PART I—AMENDMENTS TO THE COLORADO RIVER STORAGE PROJECT ACT AND PUBLIC
LAW 87–483

Sec. 10401. Amendments to the Colorado River Storage Project Act.
Sec. 10402. Amendments to Public Law 87–483.
Sec. 10403. Effect on Federal water law.

PART II—RECLAMATION WATER SETTLEMENTS FUND

Sec. 10501. Reclamation Water Settlements Fund.

PART III—NAVAJO-GALLUP WATER SUPPLY PROJECT

Sec. 10601. Purposes.

Exhibit 2 to Complaint - Page 7

123 STAT. 998          PUBLIC LAW 111–11—MAR. 30, 2009

Sec. 10602.  Authorization of Navajo-Gallup Water Supply Project.
Sec. 10603.  Delivery and use of Navajo-Gallup Water Supply Project water.
Sec. 10604.  Project contracts.
Sec. 10605.  Navajo Nation Municipal Pipeline.
Sec. 10606.  Authorization of conjunctive use wells.
Sec. 10607.  San Juan River Navajo Irrigation Projects.
Sec. 10608.  Other irrigation projects.
Sec. 10609.  Authorization of appropriations.

PART IV—Navajo Nation Water Rights

Sec. 10701.  Agreement.
Sec. 10702.  Trust Fund.
Sec. 10703.  Waivers and releases.
Sec. 10704.  Water rights held in trust.

Subtitle C—Shoshone-Paiute Tribes of the Duck Valley Reservation Water Rights
Settlement

Sec. 10801.  Findings.
Sec. 10802.  Purposes.
Sec. 10803.  Definitions.
Sec. 10804.  Approval, ratification, and confirmation of agreement; authorization.
Sec. 10805.  Tribal water rights.
Sec. 10806.  Duck Valley Indian Irrigation Project.
Sec. 10807.  Development and Maintenance Funds.
Sec. 10808.  Tribal waiver and release of claims.
Sec. 10809.  Miscellaneous.

TITLE XI—UNITED STATES GEOLOGICAL SURVEY AUTHORIZATIONS

Sec. 11001.  Reauthorization of the National Geologic Mapping Act of 1992.
Sec. 11002.  New Mexico water resources study.

TITLE XII—OCEANS

Subtitle A—Ocean Exploration

PART I—Exploration

Sec. 12001.  Purpose.
Sec. 12002.  Program established.
Sec. 12003.  Powers and duties of the Administrator.
Sec. 12004.  Ocean exploration and undersea research technology and infrastructure
             task force.
Sec. 12005.  Ocean Exploration Advisory Board.
Sec. 12006.  Authorization of appropriations.

PART II—NOAA Undersea Research Program Act of 2009

Sec. 12101.  Short title.
Sec. 12102.  Program established.
Sec. 12103.  Powers of program director.
Sec. 12104.  Administrative structure.
Sec. 12105.  Research, exploration, education, and technology programs.
Sec. 12106.  Competitiveness.
Sec. 12107.  Authorization of appropriations.

Subtitle B—Ocean and Coastal Mapping Integration Act

Sec. 12201.  Short title.
Sec. 12202.  Establishment of program.
Sec. 12203.  Interagency committee on ocean and coastal mapping.
Sec. 12204.  Biannual reports.
Sec. 12205.  Plan.
Sec. 12206.  Effect on other laws.
Sec. 12207.  Authorization of appropriations.
Sec. 12208.  Definitions.

Subtitle C—Integrated Coastal and Ocean Observation System Act of 2009

Sec. 12301.  Short title.
Sec. 12302.  Purposes.
Sec. 12303.  Definitions.
Sec. 12304.  Integrated coastal and ocean observing system.
Sec. 12305.  Interagency financing and agreements.
Sec. 12306.  Application with other laws.

Exhibit 2 to Complaint - Page 8

Sec. 12307.  Report to Congress.
Sec. 12308.  Public-private use policy.
Sec. 12309.  Independent cost estimate.
Sec. 12310.  Intent of Congress.
Sec. 12311.  Authorization of appropriations.

Subtitle D—Federal Ocean Acidification Research and Monitoring Act of 2009

Sec. 12401.  Short title.
Sec. 12402.  Purposes.
Sec. 12403.  Definitions.
Sec. 12404.  Interagency subcommittee.
Sec. 12405.  Strategic research plan.
Sec. 12406.  NOAA ocean acidification activities.
Sec. 12407.  NSF ocean acidification activities.
Sec. 12408.  NASA ocean acidification activities.
Sec. 12409.  Authorization of appropriations.

Subtitle E—Coastal and Estuarine Land Conservation Program

Sec. 12501.  Short title.
Sec. 12502.  Authorization of Coastal and Estuarine Land Conservation Program.

TITLE XIII—MISCELLANEOUS

Sec. 13001.  Management and distribution of North Dakota trust funds.
Sec. 13002.  Amendments to the Fisheries Restoration and Irrigation Mitigation Act
              of 2000.
Sec. 13003.  Amendments to the Alaska Natural Gas Pipeline Act.
Sec. 13004.  Additional Assistant Secretary for Department of Energy.
Sec. 13005.  Lovelace Respiratory Research Institute.
Sec. 13006.  Authorization of appropriations for National Tropical Botanical Garden.

TITLE XIV—CHRISTOPHER AND DANA REEVE PARALYSIS ACT

Sec. 14001.  Short title.

Subtitle A—Paralysis Research

Sec. 14101.  Activities of the National Institutes of Health with respect to research
              on paralysis.

Subtitle B—Paralysis Rehabilitation Research and Care

Sec. 14201.  Activities of the National Institutes of Health with respect to research
              with implications for enhancing daily function for persons with paral-
              ysis.

Subtitle C—Improving Quality of Life for Persons With Paralysis and Other
              Physical Disabilities

Sec. 14301.  Programs to improve quality of life for persons with paralysis and other
              physical disabilities.

TITLE XV—SMITHSONIAN INSTITUTION FACILITIES AUTHORIZATION

Sec. 15101.  Laboratory and support space, Edgewater, Maryland.
Sec. 15102.  Laboratory space, Gamboa, Panama.
Sec. 15103.  Construction of greenhouse facility.

# TITLE I—ADDITIONS TO THE NATIONAL WILDERNESS PRESERVATION SYSTEM

## Subtitle A—Wild Monongahela Wilderness

### SEC. 1001. DESIGNATION OF WILDERNESS, MONONGAHELA NATIONAL FOREST, WEST VIRGINIA.

(a) DESIGNATION.—In furtherance of the purposes of the Wilderness Act (16 U.S.C. 1131 et seq.), the following Federal lands within the Monongahela National Forest in the State of West Virginia are designated as wilderness and as either a new component of the National Wilderness Preservation System or as an addition

16 USC 1132 note.

Exhibit 2 to Complaint - Page 9

to an existing component of the National Wilderness Preservation System:

(1) Certain Federal land comprising approximately 5,144 acres, as generally depicted on the map entitled "Big Draft Proposed Wilderness" and dated March 11, 2008, which shall be known as the "Big Draft Wilderness".

(2) Certain Federal land comprising approximately 11,951 acres, as generally depicted on the map entitled "Cranberry Expansion Proposed Wilderness" and dated March 11, 2008, which shall be added to and administered as part of the Cranberry Wilderness designated by section 1(1) of Public Law 97–466 (96 Stat. 2538).

(3) Certain Federal land comprising approximately 7,156 acres, as generally depicted on the map entitled "Dolly Sods Expansion Proposed Wilderness" and dated March 11, 2008, which shall be added to and administered as part of the Dolly Sods Wilderness designated by section 3(a)(13) of Public Law 93–622 (88 Stat. 2098).

(4) Certain Federal land comprising approximately 698 acres, as generally depicted on the map entitled "Otter Creek Expansion Proposed Wilderness" and dated March 11, 2008, which shall be added to and administered as part of the Otter Creek Wilderness designated by section 3(a)(14) of Public Law 93–622 (88 Stat. 2098).

(5) Certain Federal land comprising approximately 6,792 acres, as generally depicted on the map entitled "Roaring Plains Proposed Wilderness" and dated March 11, 2008, which shall be known as the "Roaring Plains West Wilderness".

(6) Certain Federal land comprising approximately 6,030 acres, as generally depicted on the map entitled "Spice Run Proposed Wilderness" and dated March 11, 2008, which shall be known as the "Spice Run Wilderness".

(b) MAPS AND LEGAL DESCRIPTION.—

(1) FILING AND AVAILABILITY.—As soon as practicable after the date of the enactment of this Act, the Secretary of Agriculture, acting through the Chief of the Forest Service, shall file with the Committee on Natural Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate a map and legal description of each wilderness area designated or expanded by subsection (a). The maps and legal descriptions shall be on file and available for public inspection in the office of the Chief of the Forest Service and the office of the Supervisor of the Monongahela National Forest.

(2) FORCE AND EFFECT.—The maps and legal descriptions referred to in this subsection shall have the same force and effect as if included in this subtitle, except that the Secretary may correct errors in the maps and descriptions.

(c) ADMINISTRATION.—Subject to valid existing rights, the Federal lands designated as wilderness by subsection (a) shall be administered by the Secretary in accordance with the Wilderness Act (16 U.S.C. 1131 et seq.). The Secretary may continue to authorize the competitive running event permitted from 2003 through 2007 in the vicinity of the boundaries of the Dolly Sods Wilderness addition designated by paragraph (3) of subsection (a)

Exhibit 2 to Complaint - Page 10

and the Roaring Plains West Wilderness Area designated by paragraph (5) of such subsection, in a manner compatible with the preservation of such areas as wilderness.

(d) EFFECTIVE DATE OF WILDERNESS ACT.—With respect to the Federal lands designated as wilderness by subsection (a), any reference in the Wilderness Act (16 U.S.C. 1131 et seq.) to the effective date of the Wilderness Act shall be deemed to be a reference to the date of the enactment of this Act.

(e) FISH AND WILDLIFE.—As provided in section 4(d)(7) of the Wilderness Act (16 U.S.C. 1133(d)(7)), nothing in this section affects the jurisdiction or responsibility of the State of West Virginia with respect to wildlife and fish.

### SEC. 1002. BOUNDARY ADJUSTMENT, LAUREL FORK SOUTH WILDERNESS, MONONGAHELA NATIONAL FOREST.

(a) BOUNDARY ADJUSTMENT.—The boundary of the Laurel Fork South Wilderness designated by section 1(3) of Public Law 97–466 (96 Stat. 2538) is modified to exclude two parcels of land, as generally depicted on the map entitled "Monongahela National Forest Laurel Fork South Wilderness Boundary Modification" and dated March 11, 2008, and more particularly described according to the site-specific maps and legal descriptions on file in the office of the Forest Supervisor, Monongahela National Forest. The general map shall be on file and available for public inspection in the Office of the Chief of the Forest Service.

16 USC 1132 note.

(b) MANAGEMENT.—Federally owned land delineated on the maps referred to in subsection (a) as the Laurel Fork South Wilderness, as modified by such subsection, shall continue to be administered by the Secretary of Agriculture in accordance with the Wilderness Act (16 U.S.C. 1131 et seq.).

### SEC. 1003. MONONGAHELA NATIONAL FOREST BOUNDARY CONFIRMATION.

(a) IN GENERAL.—The boundary of the Monongahela National Forest is confirmed to include the tracts of land as generally depicted on the map entitled "Monongahela National Forest Boundary Confirmation" and dated March 13, 2008, and all Federal lands under the jurisdiction of the Secretary of Agriculture, acting through the Chief of the Forest Service, encompassed within such boundary shall be managed under the laws and regulations pertaining to the National Forest System.

(b) LAND AND WATER CONSERVATION FUND.—For the purposes of section 7 of the Land and Water Conservation Fund Act of 1965 (16 U.S.C. 460l–9), the boundaries of the Monongahela National Forest, as confirmed by subsection (a), shall be considered to be the boundaries of the Monongahela National Forest as of January 1, 1965.

### SEC. 1004. ENHANCED TRAIL OPPORTUNITIES.

(a) PLAN.—

(1) IN GENERAL.—The Secretary of Agriculture, in consultation with interested parties, shall develop a plan to provide for enhanced nonmotorized recreation trail opportunities on lands not designated as wilderness within the Monongahela National Forest.

(2) NONMOTORIZED RECREATION TRAIL DEFINED.—For the purposes of this subsection, the term "nonmotorized recreation

Exhibit 2 to Complaint - Page 11

123 STAT. 1002          PUBLIC LAW 111–11—MAR. 30, 2009

trail" means a trail designed for hiking, bicycling, and equestrian use.

(b) REPORT.—Not later than two years after the date of the enactment of this Act, the Secretary of Agriculture shall submit to Congress a report on the implementation of the plan required under subsection (a), including the identification of priority trails for development.

(c) CONSIDERATION OF CONVERSION OF FOREST ROADS TO RECREATIONAL USES.—In considering possible closure and decommissioning of a Forest Service road within the Monongahela National Forest after the date of the enactment of this Act, the Secretary of Agriculture, in accordance with applicable law, may consider converting the road to nonmotorized uses to enhance recreational opportunities within the Monongahela National Forest.

## Subtitle B—Virginia Ridge and Valley Wilderness

16 USC 546b note.

**SEC. 1101. DEFINITIONS.**

In this subtitle:

(1) SCENIC AREAS.—The term "scenic areas" means the Seng Mountain National Scenic Area and the Bear Creek National Scenic Area.

(2) SECRETARY.—The term "Secretary" means the Secretary of Agriculture.

**SEC. 1102. DESIGNATION OF ADDITIONAL NATIONAL FOREST SYSTEM LAND IN JEFFERSON NATIONAL FOREST AS WILDERNESS OR A WILDERNESS STUDY AREA.**

(a) DESIGNATION OF WILDERNESS.—Section 1 of Public Law 100–326 (16 U.S.C. 1132 note; 102 Stat. 584, 114 Stat. 2057), is amended—

(1) in the matter preceding paragraph (1), by striking "System—" and inserting "System:";

(2) by striking "certain" each place it appears and inserting "Certain";

(3) in each of paragraphs (1) through (6), by striking the semicolon at the end and inserting a period;

(4) in paragraph (7), by striking "; and" and inserting a period; and

(5) by adding at the end the following:

"(9) Certain land in the Jefferson National Forest comprising approximately 3,743 acres, as generally depicted on the map entitled 'Brush Mountain and Brush Mountain East' and dated May 5, 2008, which shall be known as the 'Brush Mountain East Wilderness'.

"(10) Certain land in the Jefferson National Forest comprising approximately 4,794 acres, as generally depicted on the map entitled 'Brush Mountain and Brush Mountain East' and dated May 5, 2008, which shall be known as the 'Brush Mountain Wilderness'.

"(11) Certain land in the Jefferson National Forest comprising approximately 4,223 acres, as generally depicted on the map entitled 'Seng Mountain and Raccoon Branch' and dated April 28, 2008, which shall be known as the 'Raccoon Branch Wilderness'.

Exhibit 2 to Complaint - Page 12

"(12) Certain land in the Jefferson National Forest comprising approximately 3,270 acres, as generally depicted on the map entitled 'Stone Mountain' and dated April 28, 2008, which shall be known as the 'Stone Mountain Wilderness'.

"(13) Certain land in the Jefferson National Forest comprising approximately 8,470 acres, as generally depicted on the map entitled 'Garden Mountain and Hunting Camp Creek' and dated April 28, 2008, which shall be known as the 'Hunting Camp Creek Wilderness'.

"(14) Certain land in the Jefferson National Forest comprising approximately 3,291 acres, as generally depicted on the map entitled 'Garden Mountain and Hunting Camp Creek' and dated April 28, 2008, which shall be known as the 'Garden Mountain Wilderness'.

"(15) Certain land in the Jefferson National Forest comprising approximately 5,476 acres, as generally depicted on the map entitled 'Mountain Lake Additions' and dated April 28, 2008, which is incorporated in the Mountain Lake Wilderness designated by section 2(6) of the Virginia Wilderness Act of 1984 (16 U.S.C. 1132 note; Public Law 98–586).

"(16) Certain land in the Jefferson National Forest comprising approximately 308 acres, as generally depicted on the map entitled 'Lewis Fork Addition and Little Wilson Creek Additions' and dated April 28, 2008, which is incorporated in the Lewis Fork Wilderness designated by section 2(3) of the Virginia Wilderness Act of 1984 (16 U.S.C. 1132 note; Public Law 98–586).

"(17) Certain land in the Jefferson National Forest comprising approximately 1,845 acres, as generally depicted on the map entitled 'Lewis Fork Addition and Little Wilson Creek Additions' and dated April 28, 2008, which is incorporated in the Little Wilson Creek Wilderness designated by section 2(5) of the Virginia Wilderness Act of 1984 (16 U.S.C. 1132 note; Public Law 98–586).

"(18) Certain land in the Jefferson National Forest comprising approximately 2,219 acres, as generally depicted on the map entitled 'Shawvers Run Additions' and dated April 28, 2008, which is incorporated in the Shawvers Run Wilderness designated by paragraph (4).

"(19) Certain land in the Jefferson National Forest comprising approximately 1,203 acres, as generally depicted on the map entitled 'Peters Mountain Addition' and dated April 28, 2008, which is incorporated in the Peters Mountain Wilderness designated by section 2(7) of the Virginia Wilderness Act of 1984 (16 U.S.C. 1132 note; Public Law 98–586).

"(20) Certain land in the Jefferson National Forest comprising approximately 263 acres, as generally depicted on the map entitled 'Kimberling Creek Additions and Potential Wilderness Area' and dated April 28, 2008, which is incorporated in the Kimberling Creek Wilderness designated by section 2(2) of the Virginia Wilderness Act of 1984 (16 U.S.C. 1132 note; Public Law 98–586).".

(b) DESIGNATION OF WILDERNESS STUDY AREA.—The Virginia Wilderness Act of 1984 (16 U.S.C. 1132 note; Public Law 98–586) is amended—

(1) in the first section, by inserting "as" after "cited"; and

(2) in section 6(a)—

Exhibit 2 to Complaint - Page 13

123 STAT. 1004          PUBLIC LAW 111–11—MAR. 30, 2009

(A) by striking "certain" each place it appears and inserting "Certain";

(B) in each of paragraphs (1) and (2), by striking the semicolon at the end and inserting a period;

(C) in paragraph (3), by striking "; and" and inserting a period; and

(D) by adding at the end the following:

"(5) Certain land in the Jefferson National Forest comprising approximately 3,226 acres, as generally depicted on the map entitled 'Lynn Camp Creek Wilderness Study Area' and dated April 28, 2008, which shall be known as the 'Lynn Camp Creek Wilderness Study Area'.".

16 USC 1132 note.

**SEC. 1103. DESIGNATION OF KIMBERLING CREEK POTENTIAL WILDER- NESS AREA, JEFFERSON NATIONAL FOREST, VIRGINIA.**

(a) DESIGNATION.—In furtherance of the purposes of the Wilderness Act (16 U.S.C. 1131 et seq.), certain land in the Jefferson National Forest comprising approximately 349 acres, as generally depicted on the map entitled "Kimberling Creek Additions and Potential Wilderness Area" and dated April 28, 2008, is designated as a potential wilderness area for incorporation in the Kimberling Creek Wilderness designated by section 2(2) of the Virginia Wilderness Act of 1984 (16 U.S.C. 1132 note; Public Law 98–586).

(b) MANAGEMENT.—Except as provided in subsection (c) and subject to valid existing rights, the Secretary shall manage the potential wilderness area in accordance with the Wilderness Act (16 U.S.C. 1131 et seq.).

(c) ECOLOGICAL RESTORATION.—

(1) IN GENERAL.—For purposes of ecological restoration (including the elimination of nonnative species, removal of illegal, unused, or decommissioned roads, and any other activity necessary to restore the natural ecosystems in the potential wilderness area), the Secretary may use motorized equipment and mechanized transport in the potential wilderness area until the date on which the potential wilderness area is incorporated into the Kimberling Creek Wilderness.

(2) LIMITATION.—To the maximum extent practicable, the Secretary shall use the minimum tool or administrative practice necessary to accomplish ecological restoration with the least amount of adverse impact on wilderness character and resources.

Effective date.

(d) WILDERNESS DESIGNATION.—The potential wilderness area shall be designated as wilderness and incorporated in the Kimberling Creek Wilderness on the earlier of—

Federal Register, publication. Notice.

(1) the date on which the Secretary publishes in the Federal Register notice that the conditions in the potential wilderness area that are incompatible with the Wilderness Act (16 U.S.C. 1131 et seq.) have been removed; or

(2) the date that is 5 years after the date of enactment of this Act.

16 USC 546b.

**SEC. 1104. SENG MOUNTAIN AND BEAR CREEK SCENIC AREAS, JEFFER- SON NATIONAL FOREST, VIRGINIA.**

(a) ESTABLISHMENT.—There are designated as National Scenic Areas—

Exhibit 2 to Complaint - Page 14

PUBLIC LAW 111–11—MAR. 30, 2009          123 STAT. 1005

(1) certain National Forest System land in the Jefferson National Forest, comprising approximately 5,192 acres, as generally depicted on the map entitled "Seng Mountain and Raccoon Branch" and dated April 28, 2008, which shall be known as the "Seng Mountain National Scenic Area"; and

(2) certain National Forest System land in the Jefferson National Forest, comprising approximately 5,128 acres, as generally depicted on the map entitled "Bear Creek" and dated April 28, 2008, which shall be known as the "Bear Creek National Scenic Area".

(b) PURPOSES.—The purposes of the scenic areas are—

(1) to ensure the protection and preservation of scenic quality, water quality, natural characteristics, and water resources of the scenic areas;

(2) consistent with paragraph (1), to protect wildlife and fish habitat in the scenic areas;

(3) to protect areas in the scenic areas that may develop characteristics of old-growth forests; and

(4) consistent with paragraphs (1), (2), and (3), to provide a variety of recreation opportunities in the scenic areas.

(c) ADMINISTRATION.—

(1) IN GENERAL.—The Secretary shall administer the scenic areas in accordance with—

(A) this subtitle; and

(B) the laws (including regulations) generally applicable to the National Forest System.

(2) AUTHORIZED USES.—The Secretary shall only allow uses of the scenic areas that the Secretary determines will further the purposes of the scenic areas, as described in subsection (b).

(d) MANAGEMENT PLAN.—

(1) IN GENERAL.—Not later than 2 years after the date of enactment of this Act, the Secretary shall develop as an amendment to the land and resource management plan for the Jefferson National Forest a management plan for the scenic areas.

Deadline.

(2) EFFECT.—Nothing in this subsection requires the Secretary to revise the land and resource management plan for the Jefferson National Forest under section 6 of the Forest and Rangeland Renewable Resources Planning Act of 1974 (16 U.S.C. 1604).

(e) ROADS.—

(1) IN GENERAL.—Except as provided in paragraph (2), after the date of enactment of this Act, no roads shall be established or constructed within the scenic areas.

(2) LIMITATION.—Nothing in this subsection denies any owner of private land (or an interest in private land) that is located in a scenic area the right to access the private land.

(f) TIMBER HARVEST.—

(1) IN GENERAL.—Except as provided in paragraphs (2) and (3), no harvesting of timber shall be allowed within the scenic areas.

(2) EXCEPTIONS.—The Secretary may authorize harvesting of timber in the scenic areas if the Secretary determines that the harvesting is necessary to—

(A) control fire;

Exhibit 2 to Complaint - Page 15

(B) provide for public safety or trail access; or

(C) control insect and disease outbreaks.

(3) FIREWOOD FOR PERSONAL USE.—Firewood may be harvested for personal use along perimeter roads in the scenic areas, subject to any conditions that the Secretary may impose.

(g) INSECT AND DISEASE OUTBREAKS.—The Secretary may control insect and disease outbreaks—

(1) to maintain scenic quality;

(2) to prevent tree mortality;

(3) to reduce hazards to visitors; or

(4) to protect private land.

(h) VEGETATION MANAGEMENT.—The Secretary may engage in vegetation manipulation practices in the scenic areas to maintain the visual quality and wildlife clearings in existence on the date of enactment of this Act.

(i) MOTORIZED VEHICLES.—

(1) IN GENERAL.—Except as provided in paragraph (2), motorized vehicles shall not be allowed within the scenic areas.

(2) EXCEPTIONS.—The Secretary may authorize the use of motorized vehicles—

(A) to carry out administrative activities that further the purposes of the scenic areas, as described in subsection (b);

(B) to assist wildlife management projects in existence on the date of enactment of this Act; and

(C) during deer and bear hunting seasons—

(i) on Forest Development Roads 49410 and 84b; and

(ii) on the portion of Forest Development Road 6261 designated on the map described in subsection (a)(2) as "open seasonally".

(j) WILDFIRE SUPPRESSION.—Wildfire suppression within the scenic areas shall be conducted—

(1) in a manner consistent with the purposes of the scenic areas, as described in subsection (b); and

(2) using such means as the Secretary determines to be appropriate.

(k) WATER.—The Secretary shall administer the scenic areas in a manner that maintains and enhances water quality.

(l) WITHDRAWAL.—Subject to valid existing rights, all Federal land in the scenic areas is withdrawn from—

(1) location, entry, and patent under the mining laws; and

(2) operation of the mineral leasing and geothermal leasing laws.

**SEC. 1105. TRAIL PLAN AND DEVELOPMENT.**

(a) TRAIL PLAN.—The Secretary, in consultation with interested parties, shall establish a trail plan to develop—

(1) in a manner consistent with the Wilderness Act (16 U.S.C. 1131 et seq.), hiking and equestrian trails in the wilderness areas designated by paragraphs (9) through (20) of section 1 of Public Law 100–326 (16 U.S.C. 1132 note) (as added by section 1102(a)(5)); and

(2) nonmotorized recreation trails in the scenic areas.

(b) IMPLEMENTATION REPORT.—Not later than 2 years after the date of enactment of this Act, the Secretary shall submit to

Exhibit 2 to Complaint - Page 16

Congress a report that describes the implementation of the trail plan, including the identification of priority trails for development.

(c) SUSTAINABLE TRAIL REQUIRED.—The Secretary shall develop a sustainable trail, using a contour curvilinear alignment, to provide for nonmotorized travel along the southern boundary of the Raccoon Branch Wilderness established by section 1(11) of Public Law 100–326 (16 U.S.C. 1132 note) (as added by section 1102(a)(5)) connecting to Forest Development Road 49352 in Smyth County, Virginia.

### SEC. 1106. MAPS AND BOUNDARY DESCRIPTIONS.

16 USC 546b–1.

(a) IN GENERAL.—As soon as practicable after the date of enactment of this Act, the Secretary shall file with the Committee on Energy and Natural Resources of the Senate and the Committee on Natural Resources and the Committee on Agriculture of the House of Representatives maps and boundary descriptions of—

  (1) the scenic areas;

  (2) the wilderness areas designated by paragraphs (9) through (20) of section 1 of Public Law 100–326 (16 U.S.C. 1132 note) (as added by section 1102(a)(5));

  (3) the wilderness study area designated by section 6(a)(5) of the Virginia Wilderness Act of 1984 (16 U.S.C. 1132 note; Public Law 98–586) (as added by section 1102(b)(2)(D)); and

  (4) the potential wilderness area designated by section 1103(a).

(b) FORCE AND EFFECT.—The maps and boundary descriptions filed under subsection (a) shall have the same force and effect as if included in this subtitle, except that the Secretary may correct any minor errors in the maps and boundary descriptions.

(c) AVAILABILITY OF MAP AND BOUNDARY DESCRIPTION.—The maps and boundary descriptions filed under subsection (a) shall be on file and available for public inspection in the Office of the Chief of the Forest Service.

(d) CONFLICT.—In the case of a conflict between a map filed under subsection (a) and the acreage of the applicable areas specified in this subtitle, the map shall control.

### SEC. 1107. EFFECTIVE DATE.

Any reference in the Wilderness Act (16 U.S.C. 1131 et seq.) to the effective date of that Act shall be considered to be a reference to the date of enactment of this Act for purposes of administering—

  (1) the wilderness areas designated by paragraphs (9) through (20) of section 1 of Public Law 100–326 (16 U.S.C. 1132 note) (as added by section 1102(a)(5)); and

  (2) the potential wilderness area designated by section 1103(a).

## Subtitle C—Mt. Hood Wilderness, Oregon

### SEC. 1201. DEFINITIONS.

16 USC 460uuu note.

In this subtitle:

  (1) SECRETARY.—The term "Secretary" means the Secretary of Agriculture.

  (2) STATE.—The term "State" means the State of Oregon.

Exhibit 2 to Complaint - Page 17

### SEC. 1202. DESIGNATION OF WILDERNESS AREAS.

16 USC 1132 note.

(a) DESIGNATION OF LEWIS AND CLARK MOUNT HOOD WILDERNESS AREAS.—In accordance with the Wilderness Act (16 U.S.C. 1131 et seq.), the following areas in the State of Oregon are designated as wilderness areas and as components of the National Wilderness Preservation System:

(1) BADGER CREEK WILDERNESS ADDITIONS.—Certain Federal land managed by the Forest Service, comprising approximately 4,140 acres, as generally depicted on the maps entitled "Badger Creek Wilderness—Badger Creek Additions" and "Badger Creek Wilderness—Bonney Butte", dated July 16, 2007, which is incorporated in, and considered to be a part of, the Badger Creek Wilderness, as designated by section 3(3) of the Oregon Wilderness Act of 1984 (16 U.S.C. 1132 note; 98 Stat. 273).

(2) BULL OF THE WOODS WILDERNESS ADDITION.—Certain Federal land managed by the Forest Service, comprising approximately 10,180 acres, as generally depicted on the map entitled "Bull of the Woods Wilderness—Bull of the Woods Additions", dated July 16, 2007, which is incorporated in, and considered to be a part of, the Bull of the Woods Wilderness, as designated by section 3(4) of the Oregon Wilderness Act of 1984 (16 U.S.C. 1132 note; 98 Stat. 273).

(3) CLACKAMAS WILDERNESS.—Certain Federal land managed by the Forest Service, comprising approximately 9,470 acres, as generally depicted on the maps entitled "Clackamas Wilderness—Big Bottom", "Clackamas Wilderness—Clackamas Canyon", "Clackamas Wilderness—Memaloose Lake", "Clackamas Wilderness—Sisi Butte", and "Clackamas Wilderness—South Fork Clackamas", dated July 16, 2007, which shall be known as the "Clackamas Wilderness".

(4) MARK O. HATFIELD WILDERNESS ADDITIONS.—Certain Federal land managed by the Forest Service, comprising approximately 25,960 acres, as generally depicted on the maps entitled "Mark O. Hatfield Wilderness—Gorge Face" and "Mark O. Hatfield Wilderness—Larch Mountain", dated July 16, 2007, which is incorporated in, and considered to be a part of, the Mark O. Hatfield Wilderness, as designated by section 3(1) of the Oregon Wilderness Act of 1984 (16 U.S.C. 1132 note; 98 Stat. 273).

(5) MOUNT HOOD WILDERNESS ADDITIONS.—Certain Federal land managed by the Forest Service, comprising approximately 18,450 acres, as generally depicted on the maps entitled "Mount Hood Wilderness—Barlow Butte", "Mount Hood Wilderness—Elk Cove/Mazama", "Richard L. Kohnstamm Memorial Area", "Mount Hood Wilderness—Sand Canyon", "Mount Hood Wilderness—Sandy Additions", "Mount Hood Wilderness—Twin Lakes", and "Mount Hood Wilderness—White River", dated July 16, 2007, and the map entitled "Mount Hood Wilderness—Cloud Cap", dated July 20, 2007, which is incorporated in, and considered to be a part of, the Mount Hood Wilderness, as designated under section 3(a) of the Wilderness Act (16 U.S.C. 1132(a)) and enlarged by section 3(d) of the Endangered American Wilderness Act of 1978 (16 U.S.C. 1132 note; 92 Stat. 43).

(6) ROARING RIVER WILDERNESS.—Certain Federal land managed by the Forest Service, comprising approximately

Exhibit 2 to Complaint - Page 18

PUBLIC LAW 111–11—MAR. 30, 2009          123 STAT. 1009

36,550 acres, as generally depicted on the map entitled "Roaring River Wilderness—Roaring River Wilderness", dated July 16, 2007, which shall be known as the "Roaring River Wilderness".

(7) SALMON-HUCKLEBERRY WILDERNESS ADDITIONS.—Certain Federal land managed by the Forest Service, comprising approximately 16,620 acres, as generally depicted on the maps entitled "Salmon-Huckleberry Wilderness—Alder Creek Addition", "Salmon-Huckleberry Wilderness—Eagle Creek Addition", "Salmon-Huckleberry Wilderness—Hunchback Mountain", "Salmon-Huckleberry Wilderness—Inch Creek", "Salmon-Huckleberry Wilderness—Mirror Lake", and "Salmon-Huckleberry Wilderness—Salmon River Meadows", dated July 16, 2007, which is incorporated in, and considered to be a part of, the Salmon-Huckleberry Wilderness, as designated by section 3(2) of the Oregon Wilderness Act of 1984 (16 U.S.C. 1132 note; 98 Stat. 273).

(8) LOWER WHITE RIVER WILDERNESS.—Certain Federal land managed by the Forest Service and Bureau of Land Management, comprising approximately 2,870 acres, as generally depicted on the map entitled "Lower White River Wilderness—Lower White River", dated July 16, 2007, which shall be known as the "Lower White River Wilderness".

(b) RICHARD L. KOHNSTAMM MEMORIAL AREA.—Certain Federal land managed by the Forest Service, as generally depicted on the map entitled "Richard L. Kohnstamm Memorial Area", dated July 16, 2007, is designated as the "Richard L. Kohnstamm Memorial Area".

16 USC 431 note.

(c) POTENTIAL WILDERNESS AREA; ADDITIONS TO WILDERNESS AREAS.—

16 USC 1132 note.

(1) ROARING RIVER POTENTIAL WILDERNESS AREA.—

(A) IN GENERAL.—In furtherance of the purposes of the Wilderness Act (16 U.S.C. 1131 et seq.), certain Federal land managed by the Forest Service, comprising approximately 900 acres identified as "Potential Wilderness" on the map entitled "Roaring River Wilderness", dated July 16, 2007, is designated as a potential wilderness area.

(B) MANAGEMENT.—The potential wilderness area designated by subparagraph (A) shall be managed in accordance with section 4 of the Wilderness Act (16 U.S.C. 1133).

(C) DESIGNATION AS WILDERNESS.—On the date on which the Secretary publishes in the Federal Register notice that the conditions in the potential wilderness area designated by subparagraph (A) are compatible with the Wilderness Act (16 U.S.C. 1131 et seq.), the potential wilderness shall be—

Effective date. Federal Register, publication. Notice.

(i) designated as wilderness and as a component of the National Wilderness Preservation System; and

(ii) incorporated into the Roaring River Wilderness designated by subsection (a)(6).

(2) ADDITION TO THE MOUNT HOOD WILDERNESS.—On completion of the land exchange under section 1206(a)(2), certain Federal land managed by the Forest Service, comprising approximately 1,710 acres, as generally depicted on the map entitled "Mount Hood Wilderness—Tilly Jane", dated July 20, 2007, shall be incorporated in, and considered to be a part of, the Mount Hood Wilderness, as designated under section 3(a) of the Wilderness Act (16 U.S.C. 1132(a)) and enlarged

Exhibit 2 to Complaint - Page 19

by section 3(d) of the Endangered American Wilderness Act of 1978 (16 U.S.C. 1132 note; 92 Stat. 43) and subsection (a)(5).

(3) ADDITION TO THE SALMON-HUCKLEBERRY WILDERNESS.—On acquisition by the United States, the approximately 160 acres of land identified as "Land to be acquired by USFS" on the map entitled "Hunchback Mountain Land Exchange, Clackamas County", dated June 2006, shall be incorporated in, and considered to be a part of, the Salmon-Huckleberry Wilderness, as designated by section 3(2) of the Oregon Wilderness Act of 1984 (16 U.S.C. 1132 note; 98 Stat. 273) and enlarged by subsection (a)(7).

(d) MAPS AND LEGAL DESCRIPTIONS.—

(1) IN GENERAL.—As soon as practicable after the date of enactment of this Act, the Secretary shall file a map and a legal description of each wilderness area and potential wilderness area designated by this section, with—

(A) the Committee on Energy and Natural Resources of the Senate; and

(B) the Committee on Natural Resources of the House of Representatives.

(2) FORCE OF LAW.—The maps and legal descriptions filed under paragraph (1) shall have the same force and effect as if included in this subtitle, except that the Secretary may correct typographical errors in the maps and legal descriptions.

(3) PUBLIC AVAILABILITY.—Each map and legal description filed under paragraph (1) shall be on file and available for public inspection in the appropriate offices of the Forest Service and Bureau of Land Management.

(4) DESCRIPTION OF LAND.—The boundaries of the areas designated as wilderness by subsection (a) that are immediately adjacent to a utility right-of-way or a Federal Energy Regulatory Commission project boundary shall be 100 feet from the boundary of the right-of-way or the project boundary.

(e) ADMINISTRATION.—

(1) IN GENERAL.—Subject to valid existing rights, each area designated as wilderness by this section shall be administered by the Secretary that has jurisdiction over the land within the wilderness, in accordance with the Wilderness Act (16 U.S.C. 1131 et seq.), except that—

(A) any reference in that Act to the effective date shall be considered to be a reference to the date of enactment of this Act; and

(B) any reference in that Act to the Secretary of Agriculture shall be considered to be a reference to the Secretary that has jurisdiction over the land within the wilderness.

(2) INCORPORATION OF ACQUIRED LAND AND INTERESTS.—Any land within the boundary of a wilderness area designated by this section that is acquired by the United States shall—

(A) become part of the wilderness area in which the land is located; and

(B) be managed in accordance with this section, the Wilderness Act (16 U.S.C. 1131 et seq.), and any other applicable law.

(f) BUFFER ZONES.—

Exhibit 2 to Complaint - Page 20

(1) IN GENERAL.—As provided in the Oregon Wilderness Act of 1984 (16 U.S.C. 1132 note; Public Law 98–328), Congress does not intend for designation of wilderness areas in the State under this section to lead to the creation of protective perimeters or buffer zones around each wilderness area.

(2) ACTIVITIES OR USES UP TO BOUNDARIES.—The fact that nonwilderness activities or uses can be seen or heard from within a wilderness area shall not, of itself, preclude the activities or uses up to the boundary of the wilderness area.

(g) FISH AND WILDLIFE.—Nothing in this section affects the jurisdiction or responsibilities of the State with respect to fish and wildlife.

(h) FIRE, INSECTS, AND DISEASES.—As provided in section 4(d)(1) of the Wilderness Act (16 U.S.C. 1133(d)(1)), within the wilderness areas designated by this section, the Secretary that has jurisdiction over the land within the wilderness (referred to in this subsection as the "Secretary") may take such measures as are necessary to control fire, insects, and diseases, subject to such terms and conditions as the Secretary determines to be desirable and appropriate.

(i) WITHDRAWAL.—Subject to valid rights in existence on the date of enactment of this Act, the Federal land designated as wilderness by this section is withdrawn from all forms of—

(1) entry, appropriation, or disposal under the public land laws;

(2) location, entry, and patent under the mining laws; and

(3) disposition under all laws pertaining to mineral and geothermal leasing or mineral materials.

**SEC. 1203. DESIGNATION OF STREAMS FOR WILD AND SCENIC RIVER PROTECTION IN THE MOUNT HOOD AREA.**

(a) WILD AND SCENIC RIVER DESIGNATIONS, MOUNT HOOD NATIONAL FOREST.—

(1) IN GENERAL.—Section 3(a) of the Wild and Scenic Rivers Act (16 U.S.C. 1274(a)) is amended by adding at the end the following:

"(171) SOUTH FORK CLACKAMAS RIVER, OREGON.—The 4.2-mile segment of the South Fork Clackamas River from its confluence with the East Fork of the South Fork Clackamas to its confluence with the Clackamas River, to be administered by the Secretary of Agriculture as a wild river.

"(172) EAGLE CREEK, OREGON.—The 8.3-mile segment of Eagle Creek from its headwaters to the Mount Hood National Forest boundary, to be administered by the Secretary of Agriculture as a wild river.

"(173) MIDDLE FORK HOOD RIVER.—The 3.7-mile segment of the Middle Fork Hood River from the confluence of Clear and Coe Branches to the north section line of section 11, township 1 south, range 9 east, to be administered by the Secretary of Agriculture as a scenic river.

"(174) SOUTH FORK ROARING RIVER, OREGON.—The 4.6-mile segment of the South Fork Roaring River from its headwaters to its confluence with Roaring River, to be administered by the Secretary of Agriculture as a wild river.

"(175) ZIG ZAG RIVER, OREGON.—The 4.3-mile segment of the Zig Zag River from its headwaters to the Mount Hood

Exhibit 2 to Complaint - Page 21

Wilderness boundary, to be administered by the Secretary of Agriculture as a wild river.

"(176) FIFTEENMILE CREEK, OREGON.—

"(A) IN GENERAL.—The 11.1-mile segment of Fifteenmile Creek from its source at Senecal Spring to the southern edge of the northwest quarter of the northwest quarter of section 20, township 2 south, range 12 east, to be administered by the Secretary of Agriculture in the following classes:

"(i) The 2.6-mile segment from its source at Senecal Spring to the Badger Creek Wilderness boundary, as a wild river.

"(ii) The 0.4-mile segment from the Badger Creek Wilderness boundary to the point 0.4 miles downstream, as a scenic river.

"(iii) The 7.9-mile segment from the point 0.4 miles downstream of the Badger Creek Wilderness boundary to the western edge of section 20, township 2 south, range 12 east as a wild river.

"(iv) The 0.2-mile segment from the western edge of section 20, township 2 south, range 12 east, to the southern edge of the northwest quarter of the northwest quarter of section 20, township 2 south, range 12 east as a scenic river.

"(B) INCLUSIONS.—Notwithstanding section 3(b), the lateral boundaries of both the wild river area and the scenic river area along Fifteenmile Creek shall include an average of not more than 640 acres per mile measured from the ordinary high water mark on both sides of the river.

"(177) EAST FORK HOOD RIVER, OREGON.—The 13.5-mile segment of the East Fork Hood River from Oregon State Highway 35 to the Mount Hood National Forest boundary, to be administered by the Secretary of Agriculture as a recreational river.

"(178) COLLAWASH RIVER, OREGON.—The 17.8-mile segment of the Collawash River from the headwaters of the East Fork Collawash to the confluence of the mainstream of the Collawash River with the Clackamas River, to be administered by the Secretary of Agriculture in the following classes:

"(A) The 11.0-mile segment from the headwaters of the East Fork Collawash River to Buckeye Creek, as a scenic river.

"(B) The 6.8-mile segment from Buckeye Creek to the Clackamas River, as a recreational river.

"(179) FISH CREEK, OREGON.—The 13.5-mile segment of Fish Creek from its headwaters to the confluence with the Clackamas River, to be administered by the Secretary of Agriculture as a recreational river.".

16 USC 1274 note.

(2) EFFECT.—The amendments made by paragraph (1) do not affect valid existing water rights.

(b) PROTECTION FOR HOOD RIVER, OREGON.—Section 13(a)(4) of the "Columbia River Gorge National Scenic Area Act" (16 U.S.C. 544k(a)(4)) is amended by striking "for a period not to exceed twenty years from the date of enactment of this Act,".

Exhibit 2 to Complaint - Page 22

**SEC. 1204. MOUNT HOOD NATIONAL RECREATION AREA.**

16 USC 460uuu.

(a) DESIGNATION.—To provide for the protection, preservation, and enhancement of recreational, ecological, scenic, cultural, watershed, and fish and wildlife values, there is established the Mount Hood National Recreation Area within the Mount Hood National Forest.

(b) BOUNDARY.—The Mount Hood National Recreation Area shall consist of certain Federal land managed by the Forest Service and Bureau of Land Management, comprising approximately 34,550 acres, as generally depicted on the maps entitled "National Recreation Areas—Mount Hood NRA", "National Recreation Areas—Fifteenmile Creek NRA", and "National Recreation Areas—Shellrock Mountain", dated February 2007.

(c) MAP AND LEGAL DESCRIPTION.—

(1) SUBMISSION OF LEGAL DESCRIPTION.—As soon as practicable after the date of enactment of this Act, the Secretary shall file a map and a legal description of the Mount Hood National Recreation Area with—

(A) the Committee on Energy and Natural Resources of the Senate; and

(B) the Committee on Natural Resources of the House of Representatives.

(2) FORCE OF LAW.—The map and legal description filed under paragraph (1) shall have the same force and effect as if included in this subtitle, except that the Secretary may correct typographical errors in the map and the legal description.

(3) PUBLIC AVAILABILITY.—The map and legal description filed under paragraph (1) shall be on file and available for public inspection in the appropriate offices of the Forest Service.

(d) ADMINISTRATION.—

(1) IN GENERAL.—The Secretary shall—

(A) administer the Mount Hood National Recreation Area—

(i) in accordance with the laws (including regulations) and rules applicable to the National Forest System; and

(ii) consistent with the purposes described in subsection (a); and

(B) only allow uses of the Mount Hood National Recreation Area that are consistent with the purposes described in subsection (a).

(2) APPLICABLE LAW.—Any portion of a wilderness area designated by section 1202 that is located within the Mount Hood National Recreation Area shall be administered in accordance with the Wilderness Act (16 U.S.C. 1131 et seq.).

(e) TIMBER.—The cutting, sale, or removal of timber within the Mount Hood National Recreation Area may be permitted—

(1) to the extent necessary to improve the health of the forest in a manner that—

(A) maximizes the retention of large trees—

(i) as appropriate to the forest type; and

(ii) to the extent that the trees promote stands that are fire-resilient and healthy;

(B) improves the habitats of threatened, endangered, or sensitive species; or

Exhibit 2 to Complaint - Page 23

(C) maintains or restores the composition and structure of the ecosystem by reducing the risk of uncharacteristic wildfire;

(2) to accomplish an approved management activity in furtherance of the purposes established by this section, if the cutting, sale, or removal of timber is incidental to the management activity; or

(3) for de minimus personal or administrative use within the Mount Hood National Recreation Area, where such use will not impair the purposes established by this section.

(f) ROAD CONSTRUCTION.—No new or temporary roads shall be constructed or reconstructed within the Mount Hood National Recreation Area except as necessary—

(1) to protect the health and safety of individuals in cases of an imminent threat of flood, fire, or any other catastrophic event that, without intervention, would cause the loss of life or property;

(2) to conduct environmental cleanup required by the United States;

(3) to allow for the exercise of reserved or outstanding rights provided for by a statute or treaty;

(4) to prevent irreparable resource damage by an existing road; or

(5) to rectify a hazardous road condition.

(g) WITHDRAWAL.—Subject to valid existing rights, all Federal land within the Mount Hood National Recreation Area is withdrawn from—

(1) all forms of entry, appropriation, or disposal under the public land laws;

(2) location, entry, and patent under the mining laws; and

(3) disposition under all laws relating to mineral and geothermal leasing.

(h) TRANSFER OF ADMINISTRATIVE JURISDICTION.—

(1) IN GENERAL.—Administrative jurisdiction over the Federal land described in paragraph (2) is transferred from the Bureau of Land Management to the Forest Service.

(2) DESCRIPTION OF LAND.—The land referred to in paragraph (1) is the approximately 130 acres of land administered by the Bureau of Land Management that is within or adjacent to the Mount Hood National Recreation Area and that is identified as "BLM Lands" on the map entitled "National Recreation Areas—Shellrock Mountain", dated February 2007.

**SEC. 1205. PROTECTIONS FOR CRYSTAL SPRINGS, UPPER BIG BOTTOM, AND CULTUS CREEK.**

16 USC 539n.

(a) CRYSTAL SPRINGS WATERSHED SPECIAL RESOURCES MANAGEMENT UNIT.—

(1) ESTABLISHMENT.—

(A) IN GENERAL.—On completion of the land exchange under section 1206(a)(2), there shall be established a special resources management unit in the State consisting of certain Federal land managed by the Forest Service, as generally depicted on the map entitled "Crystal Springs Watershed Special Resources Management Unit", dated June 2006 (referred to in this subsection as the "map"), to be known as the "Crystal Springs Watershed Special

Exhibit 2 to Complaint - Page 24

Resources Management Unit" (referred to in this subsection as the "Management Unit").

(B) EXCLUSION OF CERTAIN LAND.—The Management Unit does not include any National Forest System land otherwise covered by subparagraph (A) that is designated as wilderness by section 1202.

(C) WITHDRAWAL.—

(i) IN GENERAL.—Subject to valid rights in existence on the date of enactment of this Act, the Federal land designated as the Management Unit is withdrawn from all forms of—

(I) entry, appropriation, or disposal under the public land laws;

(II) location, entry, and patent under the mining laws; and

(III) disposition under all laws pertaining to mineral and geothermal leasing or mineral materials.

(ii) EXCEPTION.—Clause (i)(I) does not apply to the parcel of land generally depicted as "HES 151" on the map.

(2) PURPOSES.—The purposes of the Management Unit are—

(A) to ensure the protection of the quality and quantity of the Crystal Springs watershed as a clean drinking water source for the residents of Hood River County, Oregon; and

(B) to allow visitors to enjoy the special scenic, natural, cultural, and wildlife values of the Crystal Springs watershed.

(3) MAP AND LEGAL DESCRIPTION.—

(A) SUBMISSION OF LEGAL DESCRIPTION.—As soon as practicable after the date of enactment of this Act, the Secretary shall file a map and a legal description of the Management Unit with—

(i) the Committee on Energy and Natural Resources of the Senate; and

(ii) the Committee on Natural Resources of the House of Representatives.

(B) FORCE OF LAW.—The map and legal description filed under subparagraph (A) shall have the same force and effect as if included in this subtitle, except that the Secretary may correct typographical errors in the map and legal description.

(C) PUBLIC AVAILABILITY.—The map and legal description filed under subparagraph (A) shall be on file and available for public inspection in the appropriate offices of the Forest Service.

(4) ADMINISTRATION.—

(A) IN GENERAL.—The Secretary shall—

(i) administer the Management Unit—

(I) in accordance with the laws (including regulations) and rules applicable to units of the National Forest System; and

(II) consistent with the purposes described in paragraph (2); and

Exhibit 2 to Complaint - Page 25

(ii) only allow uses of the Management Unit that are consistent with the purposes described in paragraph (2).

(B) FUEL REDUCTION IN PROXIMITY TO IMPROVEMENTS AND PRIMARY PUBLIC ROADS.—To protect the water quality, water quantity, and scenic, cultural, natural, and wildlife values of the Management Unit, the Secretary may conduct fuel reduction and forest health management treatments to maintain and restore fire-resilient forest structures containing late successional forest structure characterized by large trees and multistoried canopies, as ecologically appropriate, on National Forest System land in the Management Unit—

(i) in any area located not more than 400 feet from structures located on—

(I) National Forest System land; or

(II) private land adjacent to National Forest System land;

(ii) in any area located not more than 400 feet from the Cooper Spur Road, the Cloud Cap Road, or the Cooper Spur Ski Area Loop Road; and

(iii) on any other National Forest System land in the Management Unit, with priority given to activities that restore previously harvested stands, including the removal of logging slash, smaller diameter material, and ladder fuels.

(5) PROHIBITED ACTIVITIES.—Subject to valid existing rights, the following activities shall be prohibited on National Forest System land in the Management Unit:

(A) New road construction or renovation of existing non-System roads, except as necessary to protect public health and safety.

(B) Projects undertaken for the purpose of harvesting commercial timber (other than activities relating to the harvest of merchantable products that are byproducts of activities conducted to further the purposes described in paragraph (2)).

(C) Commercial livestock grazing.

(D) The placement of new fuel storage tanks.

(E) Except to the extent necessary to further the purposes described in paragraph (2), the application of any toxic chemicals (other than fire retardants), including pesticides, rodenticides, or herbicides.

(6) FOREST ROAD CLOSURES.—

(A) IN GENERAL.—Except as provided in subparagraph (B), the Secretary may provide for the closure or gating to the general public of any Forest Service road within the Management Unit.

(B) EXCEPTION.—Nothing in this subsection requires the Secretary to close the road commonly known as "Cloud Cap Road", which shall be administered in accordance with otherwise applicable law.

(7) PRIVATE LAND.—

(A) EFFECT.—Nothing in this subsection affects the use of, or access to, any private property within the area identified on the map as the "Crystal Springs Zone of Contribution" by—

Exhibit 2 to Complaint - Page 26

(i) the owners of the private property; and

(ii) guests to the private property.

(B) COOPERATION.—The Secretary is encouraged to work with private landowners who have agreed to cooperate with the Secretary to further the purposes of this subsection.

(8) ACQUISITION OF LAND.—

(A) IN GENERAL.—The Secretary may acquire from willing landowners any land located within the area identified on the map as the "Crystal Springs Zone of Contribution".

(B) INCLUSION IN MANAGEMENT UNIT.—On the date of acquisition, any land acquired under subparagraph (A) shall be incorporated in, and be managed as part of, the Management Unit.

(b) PROTECTIONS FOR UPPER BIG BOTTOM AND CULTUS CREEK.—

(1) IN GENERAL.—The Secretary shall manage the Federal land administered by the Forest Service described in paragraph (2) in a manner that preserves the natural and primitive character of the land for recreational, scenic, and scientific use.

(2) DESCRIPTION OF LAND.—The Federal land referred to in paragraph (1) is—

(A) the approximately 1,580 acres, as generally depicted on the map entitled "Upper Big Bottom", dated July 16, 2007; and

(B) the approximately 280 acres identified as "Cultus Creek" on the map entitled "Clackamas Wilderness—South Fork Clackamas", dated July 16, 2007.

(3) MAPS AND LEGAL DESCRIPTIONS.—

(A) IN GENERAL.—As soon as practicable after the date of enactment of this Act, the Secretary shall file maps and legal descriptions of the Federal land described in paragraph (2) with—

(i) the Committee on Energy and Natural Resources of the Senate; and

(ii) the Committee on Natural Resources of the House of Representatives.

(B) FORCE OF LAW.—The maps and legal descriptions filed under subparagraph (A) shall have the same force and effect as if included in this subtitle, except that the Secretary may correct typographical errors in the maps and legal descriptions.

(C) PUBLIC AVAILABILITY.—Each map and legal description filed under subparagraph (A) shall be on file and available for public inspection in the appropriate offices of the Forest Service.

(4) USE OF LAND.—

(A) IN GENERAL.—Subject to valid existing rights, with respect to the Federal land described in paragraph (2), the Secretary shall only allow uses that are consistent with the purposes identified in paragraph (1).

(B) PROHIBITED USES.—The following shall be prohibited on the Federal land described in paragraph (2):

(i) Permanent roads.

(ii) Commercial enterprises.

Exhibit 2 to Complaint - Page 27

(iii) Except as necessary to meet the minimum requirements for the administration of the Federal land and to protect public health and safety—

(I) the use of motor vehicles; or

(II) the establishment of temporary roads.

(5) WITHDRAWAL.—Subject to valid existing rights, the Federal land described in paragraph (2) is withdrawn from—

(A) all forms of entry, appropriation, or disposal under the public land laws;

(B) location, entry, and patent under the mining laws; and

(C) disposition under all laws relating to mineral and geothermal leasing.

**SEC. 1206. LAND EXCHANGES.**

(a) COOPER SPUR-GOVERNMENT CAMP LAND EXCHANGE.—

(1) DEFINITIONS.—In this subsection:

(A) COUNTY.—The term "County" means Hood River County, Oregon.

(B) EXCHANGE MAP.—The term "exchange map" means the map entitled "Cooper Spur/Government Camp Land Exchange", dated June 2006.

(C) FEDERAL LAND.—The term "Federal land" means the approximately 120 acres of National Forest System land in the Mount Hood National Forest in Government Camp, Clackamas County, Oregon, identified as "USFS Land to be Conveyed" on the exchange map.

(D) MT. HOOD MEADOWS.—The term "Mt. Hood Meadows" means the Mt. Hood Meadows Oregon, Limited Partnership.

(E) NON-FEDERAL LAND.—The term "non-Federal land" means—

(i) the parcel of approximately 770 acres of private land at Cooper Spur identified as "Land to be acquired by USFS" on the exchange map; and

(ii) any buildings, furniture, fixtures, and equipment at the Inn at Cooper Spur and the Cooper Spur Ski Area covered by an appraisal described in paragraph (2)(D).

(2) COOPER SPUR-GOVERNMENT CAMP LAND EXCHANGE.—

(A) CONVEYANCE OF LAND.—Subject to the provisions of this subsection, if Mt. Hood Meadows offers to convey to the United States all right, title, and interest of Mt. Hood Meadows in and to the non-Federal land, the Secretary shall convey to Mt. Hood Meadows all right, title, and interest of the United States in and to the Federal land (other than any easements reserved under subparagraph (G)), subject to valid existing rights.

(B) COMPLIANCE WITH EXISTING LAW.—Except as otherwise provided in this subsection, the Secretary shall carry out the land exchange under this subsection in accordance with section 206 of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1716).

(C) CONDITIONS ON ACCEPTANCE.—

(i) TITLE.—As a condition of the land exchange under this subsection, title to the non-Federal land

Exhibit 2 to Complaint - Page 28

to be acquired by the Secretary under this subsection shall be acceptable to the Secretary.

(ii) TERMS AND CONDITIONS.—The conveyance of the Federal land and non-Federal land shall be subject to such terms and conditions as the Secretary may require.

(D) APPRAISALS.—

(i) IN GENERAL.—As soon as practicable after the date of enactment of this Act, the Secretary and Mt. Hood Meadows shall select an appraiser to conduct an appraisal of the Federal land and non-Federal land.

(ii) REQUIREMENTS.—An appraisal under clause (i) shall be conducted in accordance with nationally recognized appraisal standards, including—

(I) the Uniform Appraisal Standards for Federal Land Acquisitions; and

(II) the Uniform Standards of Professional Appraisal Practice.

(E) SURVEYS.—

(i) IN GENERAL.—The exact acreage and legal description of the Federal land and non-Federal land shall be determined by surveys approved by the Secretary.

(ii) COSTS.—The responsibility for the costs of any surveys conducted under clause (i), and any other administrative costs of carrying out the land exchange, shall be determined by the Secretary and Mt. Hood Meadows.

(F) DEADLINE FOR COMPLETION OF LAND EXCHANGE.— It is the intent of Congress that the land exchange under this subsection shall be completed not later than 16 months after the date of enactment of this Act.

(G) RESERVATION OF EASEMENTS.—As a condition of the conveyance of the Federal land, the Secretary shall reserve—

(i) a conservation easement to the Federal land to protect existing wetland, as identified by the Oregon Department of State Lands, that allows equivalent wetland mitigation measures to compensate for minor wetland encroachments necessary for the orderly development of the Federal land; and

(ii) a trail easement to the Federal land that allows—

(I) nonmotorized use by the public of existing trails;

(II) roads, utilities, and infrastructure facilities to cross the trails; and

(III) improvement or relocation of the trails to accommodate development of the Federal land.

(b) PORT OF CASCADE LOCKS LAND EXCHANGE.—

(1) DEFINITIONS.—In this subsection:

(A) EXCHANGE MAP.—The term "exchange map" means the map entitled "Port of Cascade Locks/Pacific Crest National Scenic Trail Land Exchange", dated June 2006.

(B) FEDERAL LAND.—The term "Federal land" means the parcel of land consisting of approximately 10 acres of National Forest System land in the Columbia River

Exhibit 2 to Complaint - Page 29

Gorge National Scenic Area identified as "USFS Land to be conveyed" on the exchange map.

(C) NON-FEDERAL LAND.—The term "non-Federal land" means the parcels of land consisting of approximately 40 acres identified as "Land to be acquired by USFS" on the exchange map.

(D) PORT.—The term "Port" means the Port of Cascade Locks, Cascade Locks, Oregon.

(2) LAND EXCHANGE, PORT OF CASCADE LOCKS-PACIFIC CREST NATIONAL SCENIC TRAIL.—

(A) CONVEYANCE OF LAND.—Subject to the provisions of this subsection, if the Port offers to convey to the United States all right, title, and interest of the Port in and to the non-Federal land, the Secretary shall, subject to valid existing rights, convey to the Port all right, title, and interest of the United States in and to the Federal land.

(B) COMPLIANCE WITH EXISTING LAW.—Except as otherwise provided in this subsection, the Secretary shall carry out the land exchange under this subsection in accordance with section 206 of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1716).

(3) CONDITIONS ON ACCEPTANCE.—

(A) TITLE.—As a condition of the land exchange under this subsection, title to the non-Federal land to be acquired by the Secretary under this subsection shall be acceptable to the Secretary.

(B) TERMS AND CONDITIONS.—The conveyance of the Federal land and non-Federal land shall be subject to such terms and conditions as the Secretary may require.

(4) APPRAISALS.—

(A) IN GENERAL.—As soon as practicable after the date of enactment of this Act, the Secretary shall select an appraiser to conduct an appraisal of the Federal land and non-Federal land.

(B) REQUIREMENTS.—An appraisal under subparagraph (A) shall be conducted in accordance with nationally recognized appraisal standards, including—

(i) the Uniform Appraisal Standards for Federal Land Acquisitions; and

(ii) the Uniform Standards of Professional Appraisal Practice.

(5) SURVEYS.—

(A) IN GENERAL.—The exact acreage and legal description of the Federal land and non-Federal land shall be determined by surveys approved by the Secretary.

(B) COSTS.—The responsibility for the costs of any surveys conducted under subparagraph (A), and any other administrative costs of carrying out the land exchange, shall be determined by the Secretary and the Port.

(6) DEADLINE FOR COMPLETION OF LAND EXCHANGE.—It is the intent of Congress that the land exchange under this subsection shall be completed not later than 16 months after the date of enactment of this Act.

(c) HUNCHBACK MOUNTAIN LAND EXCHANGE AND BOUNDARY ADJUSTMENT.—

(1) DEFINITIONS.—In this subsection:

Exhibit 2 to Complaint - Page 30

PUBLIC LAW 111–11—MAR. 30, 2009          123 STAT. 1021

(A) COUNTY.—The term "County" means Clackamas County, Oregon.

(B) EXCHANGE MAP.—The term "exchange map" means the map entitled "Hunchback Mountain Land Exchange, Clackamas County", dated June 2006.

(C) FEDERAL LAND.—The term "Federal land" means the parcel of land consisting of approximately 160 acres of National Forest System land in the Mount Hood National Forest identified as "USFS Land to be Conveyed" on the exchange map.

(D) NON-FEDERAL LAND.—The term "non-Federal land" means the parcel of land consisting of approximately 160 acres identified as "Land to be acquired by USFS" on the exchange map.

(2) HUNCHBACK MOUNTAIN LAND EXCHANGE.—

(A) CONVEYANCE OF LAND.—Subject to the provisions of this paragraph, if the County offers to convey to the United States all right, title, and interest of the County in and to the non-Federal land, the Secretary shall, subject to valid existing rights, convey to the County all right, title, and interest of the United States in and to the Federal land.

(B) COMPLIANCE WITH EXISTING LAW.—Except as otherwise provided in this paragraph, the Secretary shall carry out the land exchange under this paragraph in accordance with section 206 of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1716).

(C) CONDITIONS ON ACCEPTANCE.—

(i) TITLE.—As a condition of the land exchange under this paragraph, title to the non-Federal land to be acquired by the Secretary under this paragraph shall be acceptable to the Secretary.

(ii) TERMS AND CONDITIONS.—The conveyance of the Federal land and non-Federal land shall be subject to such terms and conditions as the Secretary may require.

(D) APPRAISALS.—

(i) IN GENERAL.—As soon as practicable after the date of enactment of this Act, the Secretary shall select an appraiser to conduct an appraisal of the Federal land and non-Federal land.

(ii) REQUIREMENTS.—An appraisal under clause (i) shall be conducted in accordance with nationally recognized appraisal standards, including—

(I) the Uniform Appraisal Standards for Federal Land Acquisitions; and

(II) the Uniform Standards of Professional Appraisal Practice.

(E) SURVEYS.—

(i) IN GENERAL.—The exact acreage and legal description of the Federal land and non-Federal land shall be determined by surveys approved by the Secretary.

(ii) COSTS.—The responsibility for the costs of any surveys conducted under clause (i), and any other administrative costs of carrying out the land exchange, shall be determined by the Secretary and the County.

Exhibit 2 to Complaint - Page 31

(F) DEADLINE FOR COMPLETION OF LAND EXCHANGE.—It is the intent of Congress that the land exchange under this paragraph shall be completed not later than 16 months after the date of enactment of this Act.

(3) BOUNDARY ADJUSTMENT.—

(A) IN GENERAL.—The boundary of the Mount Hood National Forest shall be adjusted to incorporate—

(i) any land conveyed to the United States under paragraph (2); and

(ii) the land transferred to the Forest Service by section 1204(h)(1).

(B) ADDITIONS TO THE NATIONAL FOREST SYSTEM.—The Secretary shall administer the land described in subparagraph (A)—

(i) in accordance with—

(I) the Act of March 1, 1911 (commonly known as the "Weeks Law") (16 U.S.C. 480 et seq.); and

(II) any laws (including regulations) applicable to the National Forest System; and

(ii) subject to sections 1202(c)(3) and 1204(d), as applicable.

(C) LAND AND WATER CONSERVATION FUND.—For the purposes of section 7 of the Land and Water Conservation Fund Act of 1965 (16 U.S.C. 460l–9), the boundaries of the Mount Hood National Forest modified by this paragraph shall be considered to be the boundaries of the Mount Hood National Forest in existence as of January 1, 1965.

(d) CONDITIONS ON DEVELOPMENT OF FEDERAL LAND.—

(1) REQUIREMENTS APPLICABLE TO THE CONVEYANCE OF FEDERAL LAND.—

(A) IN GENERAL.—As a condition of each of the conveyances of Federal land under this section, the Secretary shall include in the deed of conveyance a requirement that applicable construction activities and alterations shall be conducted in accordance with—

(i) nationally recognized building and property maintenance codes; and

(ii) nationally recognized codes for development in the wildland-urban interface and wildfire hazard mitigation.

(B) APPLICABLE LAW.—To the maximum extent practicable, the codes required under subparagraph (A) shall be consistent with the nationally recognized codes adopted or referenced by the State or political subdivisions of the State.

(C) ENFORCEMENT.—The requirements under subparagraph (A) may be enforced by the same entities otherwise enforcing codes, ordinances, and standards.

(2) COMPLIANCE WITH CODES ON FEDERAL LAND.—The Secretary shall ensure that applicable construction activities and alterations undertaken or permitted by the Secretary on National Forest System land in the Mount Hood National Forest are conducted in accordance with—

(A) nationally recognized building and property maintenance codes; and

Exhibit 2 to Complaint - Page 32

(B) nationally recognized codes for development in the wildland-urban interface development and wildfire hazard mitigation.

(3) EFFECT ON ENFORCEMENT BY STATES AND POLITICAL SUBDIVISIONS.—Nothing in this subsection alters or limits the power of the State or a political subdivision of the State to implement or enforce any law (including regulations), rule, or standard relating to development or fire prevention and control.

### SEC. 1207. TRIBAL PROVISIONS; PLANNING AND STUDIES.

(a) TRANSPORTATION PLAN.—

(1) IN GENERAL.—The Secretary shall seek to participate in the development of an integrated, multimodal transportation plan developed by the Oregon Department of Transportation for the Mount Hood region to achieve comprehensive solutions to transportation challenges in the Mount Hood region—

(A) to promote appropriate economic development;

(B) to preserve the landscape of the Mount Hood region; and

(C) to enhance public safety.

(2) ISSUES TO BE ADDRESSED.—In participating in the development of the transportation plan under paragraph (1), the Secretary shall seek to address—

(A) transportation alternatives between and among recreation areas and gateway communities that are located within the Mount Hood region;

(B) establishing park-and-ride facilities that shall be located at gateway communities;

(C) establishing intermodal transportation centers to link public transportation, parking, and recreation destinations;

(D) creating a new interchange on Oregon State Highway 26 located adjacent to or within Government Camp;

(E) designating, maintaining, and improving alternative routes using Forest Service or State roads for—

(i) providing emergency routes; or

(ii) improving access to, and travel within, the Mount Hood region;

(F) the feasibility of establishing—

(i) a gondola connection that—

(I) connects Timberline Lodge to Government Camp; and

(II) is located in close proximity to the site of the historic gondola corridor; and

(ii) an intermodal transportation center to be located in close proximity to Government Camp;

(G) burying power lines located in, or adjacent to, the Mount Hood National Forest along Interstate 84 near the City of Cascade Locks, Oregon; and

(H) creating mechanisms for funding the implementation of the transportation plan under paragraph (1), including—

(i) funds provided by the Federal Government;

(ii) public-private partnerships;

(iii) incremental tax financing; and

Exhibit 2 to Complaint - Page 33

PUBLIC LAW 111–11—MAR. 30, 2009

(iv) other financing tools that link transportation infrastructure improvements with development.

(b) MOUNT HOOD NATIONAL FOREST STEWARDSHIP STRATEGY.—

Reports.

(1) IN GENERAL.—The Secretary shall prepare a report on, and implementation schedule for, the vegetation management strategy (including recommendations for biomass utilization) for the Mount Hood National Forest being developed by the Forest Service.

(2) SUBMISSION TO CONGRESS.—

(A) REPORT.—Not later than 1 year after the date of enactment of this Act, the Secretary shall submit the report to—

(i) the Committee on Energy and Natural Resources of the Senate; and

(ii) the Committee on Natural Resources of the House of Representatives.

Deadline.

(B) IMPLEMENTATION SCHEDULE.—Not later than 1 year after the date on which the vegetation management strategy referred to in paragraph (1) is completed, the Secretary shall submit the implementation schedule to—

(i) the Committee on Energy and Natural Resources of the Senate; and

(ii) the Committee on Natural Resources of the House of Representatives.

(c) LOCAL AND TRIBAL RELATIONSHIPS.—

(1) MANAGEMENT PLAN.—

(A) IN GENERAL.—The Secretary, in consultation with Indian tribes with treaty-reserved gathering rights on land encompassed by the Mount Hood National Forest and in a manner consistent with the memorandum of understanding entered into between the Department of Agriculture, the Bureau of Land Management, the Bureau of Indian Affairs, and the Confederated Tribes and Bands of the Warm Springs Reservation of Oregon, dated April 25, 2003, as modified, shall develop and implement a management plan that meets the cultural foods obligations of the United States under applicable treaties, including the Treaty with the Tribes and Bands of Middle Oregon of June 25, 1855 (12 Stat. 963).

(B) EFFECT.—This paragraph shall be considered to be consistent with, and is intended to help implement, the gathering rights reserved by the treaty described in subparagraph (A).

(2) SAVINGS PROVISIONS REGARDING RELATIONS WITH INDIAN TRIBES.—

(A) TREATY RIGHTS.—Nothing in this subtitle alters, modifies, enlarges, diminishes, or abrogates the treaty rights of any Indian tribe, including the off-reservation reserved rights secured by the Treaty with the Tribes and Bands of Middle Oregon of June 25, 1855 (12 Stat. 963).

(B) TRIBAL LAND.—Nothing in this subtitle affects land held in trust by the Secretary of the Interior for Indian tribes or individual members of Indian tribes or other land acquired by the Army Corps of Engineers and administered by the Secretary of the Interior for the benefit of Indian tribes and individual members of Indian tribes.

(d) RECREATIONAL USES.—

Exhibit 2 to Complaint - Page 34

(1) MOUNT HOOD NATIONAL FOREST RECREATIONAL WORKING GROUP.—The Secretary may establish a working group for the purpose of providing advice and recommendations to the Forest Service on planning and implementing recreation enhancements in the Mount Hood National Forest.

(2) CONSIDERATION OF CONVERSION OF FOREST ROADS TO RECREATIONAL USES.—In considering a Forest Service road in the Mount Hood National Forest for possible closure and decommissioning after the date of enactment of this Act, the Secretary, in accordance with applicable law, shall consider, as an alternative to decommissioning the road, converting the road to recreational uses to enhance recreational opportunities in the Mount Hood National Forest.

(3) IMPROVED TRAIL ACCESS FOR PERSONS WITH DISABILITIES.—The Secretary, in consultation with the public, may design and construct a trail at a location selected by the Secretary in Mount Hood National Forest suitable for use by persons with disabilities.

# Subtitle D—Copper Salmon Wilderness, Oregon

### SEC. 1301. DESIGNATION OF THE COPPER SALMON WILDERNESS.

(a) DESIGNATION.—Section 3 of the Oregon Wilderness Act of 1984 (16 U.S.C. 1132 note; Public Law 98–328) is amended—

(1) in the matter preceding paragraph (1), by striking "eight hundred fifty-nine thousand six hundred acres" and inserting "873,300 acres";

(2) in paragraph (29), by striking the period at the end and inserting "; and"; and

(3) by adding at the end the following:

"(30) certain land in the Siskiyou National Forest, comprising approximately 13,700 acres, as generally depicted on the map entitled 'Proposed Copper Salmon Wilderness Area' and dated December 7, 2007, to be known as the 'Copper Salmon Wilderness'.".

(b) MAPS AND LEGAL DESCRIPTION.—

(1) IN GENERAL.—As soon as practicable after the date of enactment of this Act, the Secretary of Agriculture (referred to in this subtitle as the "Secretary") shall file a map and a legal description of the Copper Salmon Wilderness with—

(A) the Committee on Energy and Natural Resources of the Senate; and

(B) the Committee on Natural Resources of the House of Representatives.

(2) FORCE OF LAW.—The map and legal description filed under paragraph (1) shall have the same force and effect as if included in this subtitle, except that the Secretary may correct typographical errors in the map and legal description.

(3) BOUNDARY.—If the boundary of the Copper Salmon Wilderness shares a border with a road, the Secretary may only establish an offset that is not more than 150 feet from the centerline of the road.

(4) PUBLIC AVAILABILITY.—Each map and legal description filed under paragraph (1) shall be on file and available for public inspection in the appropriate offices of the Forest Service.

Exhibit 2 to Complaint - Page 35

# Congress of the United States
## Washington, DC 20515

June 30, 2015

Tom Tidwell, Chief
U.S. Forest Service
1400 Independence Avenue, S.W.
Washington, DC 20250-1111

Dear Chief Tidwell:

We write to strongly urge the Forest Service to complete the Cooper Spur / Government Camp land exchange mandated by the Omnibus Public Lands Act of 2009 (PL 111-11, "2009 Act"). While we acknowledge and appreciate the agency's efforts and progress toward completion of the exchange, we are extremely concerned that its resolution is very delinquent, and this lack of completion is clearly contrary to our legislative intent, the language of the 2009 Act, and the interests of the public and our environment.

The purpose of this land exchange was to help resolve decades of dispute over proposed development on the northeast side of Mt. Hood, as well as to guide future development on the mountain's south side in a manner consistent with state and local land use laws. By requiring the exchange, we intended that the land in Government Camp be prioritized for development, and the larger parcel at Cooper Spur be protected from development under federal ownership. These are important results for the local communities in Government Camp and the Hood River Valley, and they achieve significant preservation of habitat and watershed health on the northeast side of the mountain. Thus, this exchange had – and continues to have – the broad support of local businesses, conservation organizations, and citizen groups, as well as the Oregon Congressional delegation.

However, completion of the exchange is exceptionally behind the schedule set by the 2009 Act. In that legislation, Congress required the Forest Service to complete the exchange within 16 months. It has now been nearly 75 months, and the parties have yet to reach agreement over the terms of the wetland conservation easement, one of several remaining components.

The most recent complication is the conservation easement for the wetlands on the Government Camp parcels. This is just one challenge in a long history of delays on this land exchange, in spite of our repeated calls for urgency on behalf of the Mt. Hood community and the environment. The Mt. Hood National Forest and Mt. Hood Meadows have been working on the easement for over a year, but the Forest Service recently has indicated its willingness to negotiate no further.

Exhibit 3 to Complaint - Page 1

We urgently ask that the agency come back to the table and provide further opportunity to discuss, refine, and resolve the language of the easement toward achievement of the purpose of the exchange: marketable and financeable development of the Government Camp parcels for conservation at Cooper Spur. Furthermore, we call upon the agency to complete the remaining components of the land exchange within one year from the date of this letter in order to avoid further noncompliance with the statutory deadline and further frustration of the intent of the 2009 Act.

It would be best if the Forest Service took swift action now to resolve this inefficient, long protracted process. Failure to do so will likely elicit strong response from the public, possibly subjecting the agency to lawsuit, and will also necessitate other Congressional action. Let's bring this nearly five year delayed land exchange to a close; any further delay is absolutely unacceptable.

Sincerely,

Earl Blumenauer
Member of Congress

Ron Wyden
United States Senator

Jeff Merkley
United States Senator

CC:    Jim Peña, Regional Forester
       Pacific Northwest Region
       U.S. Forest Service
       1220 SW 3rd Avenue
       Portland, OR  97204

Exhibit 3 to Complaint - Page 2

# Congress of the United States

### Washington, DC 20515

September 12, 2014

Ms. Lisa Northrop
Supervisor, Mt. Hood National Forest
16400 Champion Way
Sandy, Oregon 97055

Dear Supervisor Northrop:

We are writing to affirm the importance of completing the Government Camp/Cooper Spur land exchange, which was included in the  Omnibus Public Lands Management Act of 2009 (PL 111-11). We appreciate the efforts of the United States Forest Service, Mt. Hood Meadows LLC, the Hood River Valley Residents Committee, and other stakeholders over the last two decades to bring the land exchange to where it stands today.

As you know, the Government Camp/Cooper Spur land exchange would resolve decades of dispute over proposed development on the north side of the mountain, and guide future development on the south side in a manner that is consistent with local zoning and planned growth. The land exchange has bipartisan support from the Oregon Congressional delegation, as well as local businesses, conservation organizations, and citizens groups. Unfortunately despite the hard work of many, including Forest Service staff, this exchange has dragged on far beyond the time period laid out in the legislation and has suffered from a lack of resources and staff, who have frequently changed during this process.  We urge you to put in the resources needed to get this exchange completed swiftly.

It is also our understanding that the process has reached a point where nearly all of the encumbrances to the Government Camp property are resolved, and that one remaining obstacle is the drafting of a conservation easement for the existing wetlands on the Government Camp property. As you know, an easement was included in PL 111-11 as a condition of the land conveyance in Sec. 1206 (a)(2)(G), which states:

"As a condition of the conveyance of the Federal land, the Secretary shall reserve— (i) a conservation easement to the Federal land to protect existing wetland, as identified by the Oregon Department of State Lands, that allows equivalent wetland mitigation measures to compensate for minor wetland encroachments necessary for the orderly development of the Federal land; (ii) a trail easement to the Federal land that allows –(I) nonmotorized use by the public of existing trails; (II) roads, utilities, and infrastructure facilities to cross the trails; and (III) improvement or relocation of the trails to accommodate development of the Federal land."

The intention of the legislation was to ensure that the easements provide certainty in terms of both protecting existing wetlands and public access to trails, and mitigating for minor encroachments as a result of developing the land. The easements should not be drafted in a way that creates uncertainty, additional process, or consultation that is above and beyond what is already required by state and federal law.

Exhibit 4 to Complaint - Page 1

We appreciate the hard work that you, your staff, and your predecessors have undertaken to reach this point in implementing the exchange, and we urge you to continue working with all parties to find a workable solution and proceed with the next steps in the land exchange.

Sincerely,

Ron Wyden
United States Senator

Earl Blumenauer
Member of Congress

Exhibit 4 to Complaint - Page 2



**Oregon**

Theodore R. Kulongoski, Governor

Department of State Lands
775 Summer Street NE, Suite 100
Salem, OR 97301-1279
(503) 378-3805
FAX (503) 378-4844
www.oregonstatelands.us

State Land Board

Theodore R. Kulongoski
Governor

Bill Bradbury
Secretary of State

Randall Edwards
State Treasurer

October 25, 2007

Dave Riley
Mt. Hood Meadows Ski Resort
PO Box 470
Mt. Hood, OR 97041

Re:    Wetland Delineation Report for 80 Acre Parcel north of Government
       Camp Loop Road & west of Alpen Way and 40 Acre Parcel north of
       Liege Lane & east of Camp Creek Trail, Government Camp, Clackamas
       County; T 3S, R 8E, Sec. 13, Tax Lot 160; T 3S, R 8.5E, Sec.18, Tax
       Lot 130 (portion); WD #06-0595

Dear Mr. Riley:

The Department of State Lands has reviewed the wetland delineation report prepared
by Terra Science, Inc. for the site referenced above.  Please note that the study area
only includes Tax Lot 160 and a portion of Tax Lot 130 (please see the attached maps).
Based on the information presented in the report, we concur with the wetland and
waterway boundaries as mapped in Figures 3A and 3B of the report.  Within the 2 study
areas, 9 wetland units totaling 8.49 acres, 5 perennial creeks totaling 0.28 acres, and 2
overflow ditches totaling 0.07 acres were identified.  The overflow ditches outside of a
wetland area are non-jurisdictional.  The wetlands and waterways are subject to the
permit requirements of the state Removal-Fill Law.  A state permit is required for fill or
excavation of 50 cubic yards or more in a wetland area or below the ordinary high water
line of a waterway (the 2 year recurrence interval flood elevation, if OHWL cannot be
determined).

This concurrence is for purposes of the state Removal-Fill Law only.  Federal or local
permit requirements may apply as well.  The Army Corps of Engineers will review the
report and make a determination of jurisdiction for purposes of the Clean Water Act at
the time that a permit application is submitted.  We recommend that you attach a copy
of this concurrence letter to both copies of any subsequent joint permit application to
speed application review.

Please be advised that state law establishes a preference for avoidance of wetland
impacts.  Because measures to avoid and minimize wetland impacts may include
reconfiguring parcel layout and size or development design, we recommend that you
work with Department staff on appropriate site design before completing the city or
county land use approval process.  The permit coordinator for this site is Mike McCabe.

This concurrence is based on information provided to the agency. The jurisdictional determination is valid for five years from the date of this letter, unless new information necessitates a revision. Circumstances under which the Department may change a determination and procedures for renewal of an expired determination are found in OAR 141-090-0045 (available on our web site or upon request). The applicant, landowner, or agent may submit a request for reconsideration of this determination in writing within 60 calendar days of the date of this letter.

Thank you for having the site evaluated. Please phone me at (503) 986-5236 if you have any questions.

Sincerely,

Janet C. Morlan, PWS
Wetlands Program Manager

cc:    Jason Clinch, Terra Science, Inc.
       Clackamas County Planning Department
       Jan Stuart, Corps of Engineers
       Mike McCabe, DSL

Exhibit 5 to Complaint - Page 2